**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| GREENLATINOS, and COLORADO IMMIGRANT RIGHTS COALITION,<br><br>Plaintiffs,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of the UNITED STATES DEPARTMENT OF HOMELAND SECURITY;<br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br>DAVID J. VENTURELLA, in his official capacity as Acting Director of the UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT;<br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT,<br><br>Defendants. | ) | Case No. |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1. This is an action for declaratory and injunctive relief under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and the Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq., to halt the unlawful construction, modification, and prevent the operation of a planned federal immigrant detention facility for up to 1,250 detainees, which the Defendants are calling the "Big Horn Detention Facility" ("Big Horn"), in the small town of

Hudson, Colorado. Big Horn will be operated by the private prison company, GEO Group,[1] pursuant to a half a billion dollar sole source contract with Defendants. Transportation services are part of the contractor's responsibility. Big Horn would almost double the population of Hudson, but Hudson and the surrounding area lack the infrastructure and environmental capacity to safely and effectively handle this rapid expansion.

2. For example, immigration detention centers pose a significant risk to people inside and outside of the detention center being exposed to and contracting infectious diseases such as tuberculosis, measles, and Covid-19. Without a NEPA analysis, there is no public information available to demonstrate that ICE has done anything to prepare Big Horn to address and mitigate this risk. Rather, the opposite is true. ICE's contractor for Big Horn, GEO Group, has pursued a dangerous, noncooperative approach to dealing with infectious diseases. GEO Group's irresponsibility with protecting people from infectious disease at its immigrant detention facility in Aurora, Colorado was so extreme that the Colorado Department of Public Health and the Environment had to recently sue GEO Group and move for a preliminary injunction.

3. Air pollution is another example. Hudson is located in the Denver Metro/North Front Range area that for over 15 years has been in violation of the U.S. Environmental Protection Agency ("EPA") national ambient air quality standards for ground level ozone, commonly referred to as smog. Smog can cause a variety of adverse health effects including asthma attacks and even death. The Colorado Department of Public Health and the Environment and EPA have developed

[1] This complaint uses the name GEO Group to also refer to the various subsidiaries of GEO Group that are also involved in this project.

five different plans over the years to bring the pollution levels in Denver Metro/North Front Range to below the standards. All five of these plans have objectively failed. In fact, in 2026, all three of the State's ozone monitors closest to the Town of Hudson have measured ozone above the level of the EPA standard. In addition to the devastating health and environmental impacts from this smog, because of all the failed plans, the Clean Air Act will soon impose significant economic consequences for certain existing sources of pollution unless ozone levels can be brought to below the EPA standard.

4. Yet, Secretary Mullin, the Department of Homeland Security, the Immigration and Customs Enforcement, and acting Immigration and Customs Enforcement Director Venturella [collectively "ICE" or "Defendants"] have decided to open Big Horn, which will contribute to Metro Denver's severe ozone pollution through both its smokestacks at the facility, as well as the tailpipes and airplane engines used to move detainees, supplies, and visitors to and from Big Horn.

5. Infectious disease and air pollution are just two of several significant adverse impacts that Big Horn will have. Others include water supply, which will come from the Colorado River, which is in crisis because of over withdrawal; wastewater discharges, for which EPA previously fined GEO Group because of the damage caused by the water pollution; traffic, including causing backups on interstate highways; emergency services; hazardous materials and waste; and harm to wildlife.

6. NEPA requires "the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony." 42 U.S.C. § 4331. NEPA has a dual function of generating federal attention to

environmental concerns and revealing that federal consideration for public scrutiny. NEPA requires that before undertaking a "major Federal action," an agency must conduct one of possible types of analysis to comply with NEPA: (1) prepare a robust environmental impact statement ("EIS"); (2) prepare a more streamlined environmental assessment ("EA"); or (3) invoke a categorical exclusion. *See* 42 U.S.C. § 4336; *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004).

7. ICE completely failed to conduct any analysis under NEPA for Big Horn. This seems to be a pattern of illegal activity by ICE. *See e.g. State of Arizona v. Mullin*, 2:26-cv-02857-PHX-SMB (D. Az. July 8, 2026) Dkt. No. 19, Stipulated Order Staying Case and Deferring Preliminary Injunction (ICE agrees to a stipulated order preventing it from constructing an ICE detention facility in Arizona or detaining any individuals there until it conducts and completes a NEPA analysis); *State of Maryland v. Mullin*, 1:26-cv-00733-BAH (D. Md. April 15, 2026) Dkt. No. 42, Order (granting preliminary injunction enjoining construction and renovation of warehouse for purposes of operating it as a detention and processing facility for violations of NEPA); *County of Santa Clara v. ICE*, 26-cv-05604-EKL (N.D. Cal. Sept. 11, 2026) Dkt. No. 66, Order Granting Preliminary Injunction at 1 (granting preliminary injunction halting construction of an immigration enforcement and detainee facility in Gilroy, California for failure to analyze under NEPA the facility's potential environmental consequences of the construction and future use of the facility).

8. But before and after the agency actions at issue in this case ICE has demonstrated that it knows that actions like the ones at issue in this case do require a NEPA analysis. For example, before the actions at issue in this case, on December 29, 2016 the Department of Homeland Security and Immigration and Customs Enforcement issued an Environmental

Assessment pursuant to NEPA for a proposed contractor-owned, contractor-operated ICE Detention Facility in the Houston, Texas area. Similarly, on September 15, 2021, the Department of Homeland Security and Immigration and Customs Enforcement issued an Environmental Assessment pursuant to NEPA for dormitories to hold detainees at the El Paso Service Processing Center. After the agency actions at issue in this case, ICE issued a request for proposal for turnkey detention facilities in multiple areas, including Denver. In ICE's request for proposal, ICE said that the contractor must supply environmental and site information including information to support the Government's NEPA review.

9. By illegally failing to conduct a NEPA analysis, ICE has denied itself, members of the public, and Colorado elected officials, including its U.S. Senators and a member of Congress, critical information about the consequences of ICE's choices and actions, opportunities to mitigate adverse impacts, and the opportunity to submit comments to obtain better outcomes.

10. Plaintiffs seek an injunction and declaratory relief to halt pre-construction activities, construction, and prevent operations at Big Horn unless and until Defendants comply with NEPA.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1346(a)(2) and 5 U.S.C. §§ 701–706 (APA). Defendants' decision to establish and operate the Big Horn ICE Detention Facility is a final agency action. Defendants' decisions to

enter into multiple contracts with GEO Group for the operation of Big Horn, including transportation services, are final agency actions.

12. This case does not concern federal taxes, is not a proceeding under 11 U.S.C. § 505 or 1146 of Title 11, and does not involve the Tariff Act of 1930. Thus, this Court has jurisdiction to order declaratory relief under 28 U.S.C. § 2201. If the Court orders declaratory relief, 28 U.S.C. § 2202 authorizes this Court to issue injunctive relief.

13. Venue is proper in the District of Colorado pursuant to 28 U.S.C. §§ 1391(b) & 1391(e)(1). A substantial part of the events or omissions giving rise to the claims occurred in this district. Big Horn is located in this district. Defendants U.S. Department of Homeland Security and Immigration and Customs Enforcement reside in this district as they have substantial contacts with this district and are subject to the court's personal jurisdiction. Plaintiffs CIRC maintain their principal place of business in Denver, which is in this district.

## **PARTIES**

14. GreenLatinos is a national nonprofit organization that convenes a broad coalition of Latino leaders committed to addressing environmental, natural resources, and conservation issues that significantly affect the health and welfare of the Latino community. GreenLatinos engages in this advocacy at the national, regional, and local levels. It strives to amplify the voices of minority, low-income, and tribal communities and to advance health equity, environmental justice, and community resilience. Environmental justice, clean energy and transportation, clean air, and climate change are among the organization's core priorities.

15. Colorado Immigrant Rights Coalition ("CIRC") is a statewide, membership-based coalition of immigrant, faith, labor, youth, community, business and ally organizations founded in 2002 to improve the lives of immigrants and refugees by making Colorado a more welcoming, immigrant-friendly state.

16. The Plaintiffs' members live, work, recreate, travel, and engage in other activities throughout the area affected by the actions in this complaint and will continue to do so on a regular basis. This includes Plaintiffs' members who will visit Big Horn should it open, including members who will have to conduct such visits as part of their jobs. Environmental impacts and risks associated with Big Horn threaten and damage, and will continue to threaten and damage, the health, welfare, and aesthetic, recreational, and financial interests of Plaintiffs' members, as well as their ability to engage in and enjoy their other activities.

17. The members include people in categories that have a heightened risk of adverse health outcomes, including death, from exposure to ground level ozone, commonly referred to as smog. These categories include the elderly, the young, people with preexisting respiratory problems such as asthma, and people who exercise or work outdoors. These members are concerned that emissions caused by Big Horn that form ozone will harm their health, increase or prolong medication use, which they have to purchase, limit activities, and reduce quality of life.

18. These members reside in the Denver-Metro/North Front Range 2008 and 2015 ozone national ambient air quality standards nonattainment area. Big Horn is also located within the same nonattainment area.

19. For example, one member is 73 years old and lives in the Denver Metro/North Front Range 2008 and 2015 ozone national ambient air quality standards nonattainment areas. She has cardiovascular conditions including palpitations and atrial fibrillation.

20. She has visited the Big Horn site approximately six times to exercise her First Amendment rights to engage in protests regarding the planned detention center. She also enjoys recreating in the area surrounding the Big Horn site, including hiking at Barr Lake and birding at Rocky Mountain Arsenal Wildlife Refuge. She enjoys birding to appreciate her natural surroundings and admire the wildlife.

21. She is concerned that ozone, nitrogen oxides, and particulate matter caused by Big Horn will adversely affect her health and impede her ability to participate in, or lessen her enjoyment of, the physical activities she enjoys engaging in.

22. Another member is 68 years old and suffers from asthma. She has to take several different types of medicine for her asthma. She has to spend her money to obtain these medicines. She also frequently monitors air quality alerts on her cell phone. She lives in the Denver Metro/North Front Range 2008 and 2015 ozone national ambient air quality standards nonattainment areas

23. She has visited Big Horn. She definitely plans to return to the site within the next year.

24. She enjoys hiking in natural areas in Boulder County. She also bikes in Boulder County. She plans to continue engaging in these activities.

25. She also plans to go to the Pawnee National Grasslands to go bird watching and hiking.

26. She is concerned that ozone, nitrogen oxides, and particulate matter caused by Big Horn will adversely affect her health and impede her ability to participate in, or lessen her enjoyment of, the physical activities she enjoys engaging in.

27. Plaintiffs and their members also suffer informational injury from Defendants violation of NEPA. They have been denied information that they are legally entitled to. For example, NEPA entitles the Plaintiffs to information about the ozone precursor emissions caused by Big Horn. This is not merely a matter of spending the organizations' resources to calculate the emissions. Rather, there are inputs into such calculations, like the number of trips and types of vehicles used, which Defendants alone have. If Defendants had provided this information as required by NEPA, Plaintiffs would use this information in their work, such as submitting comments on Denver Metro/North Front Range ozone nonattainment state implementation plan elements like the reasonable further progress, emission inventories, attainment demonstration, and contingency measures elements.

28. Plaintiffs and their members also suffer procedural injuries, including but not limited to the right to submit public comments on an environmental analysis the Defendants are required to conduct pursuant to NEPA.

29. The members' injuries are germane to the Plaintiffs' mission described above. Neither the claims asserted nor the relief requested require the participation of the individual members.

30. The injuries described are actual, concrete injuries, and they will continue to occur unless this Court grants relief. The relief sought herein would redress those harms.

31. Defendants Secretary Markwayne Mullin, in his official capacity as Secretary of the United States Department of Homeland Security and Acting Director David J. Venturella, in his official capacity as Acting Director of the United States Immigration and Customs Enforcement agency, are federal officials responsible for immigration enforcement and detention and have authority over the decisions, contracts, and arrangements for the use of Big Horn as a detention center. Defendants U.S. Department of Homeland Security and Immigration and Customs Enforcement are agencies of the United States with authority over ICE Detention Facilities.

## FACTS

### *Big Horn Facility*

**32.** The facility that ICE now refers to as the Big Horn Facility is located at 3001 Juniper Street, Hudson, Colorado 80642. It was formerly known as the Hudson Correctional Facility and is often referred to in documents as HCF. The facility and property is owned by Highlands REIT, a real estate investment trust based in Chicago. Highlands REIT rented the Facility for an ICE Detention Facility to the GEO Group on August 1, 2026.

**33.** ICE has entered into at least two contracts with GEO to operate Big Horn. Defendants began the approval process for using the facility as an ICE Detention Center as far back as May 2025. ICE made a decision to select Big Horn as an ICE Detention Center as far back as August 2025.

34. Defendants entered into a letter contract on or about December 1, 2025 with the GEO Group to have the GEO Group run the Big Horn Facility as an ICE Detention Facility. The

letter contract was for approximately $39 million for six months of these services. A DHS employee noted that "[t]hat seems high".

35. There was no competition or bidding for this letter contract; Defendants issued the $39 million letter contract as a sole source contract.

36. This is despite that fact that another entity, a non-profit organization called Social Purposes Corrections, had also proposed the Hudson Facility to ICE in response to an ICE Request For Information ("RFI").[2] Social Purposes Corrections offered to use ICE's National Detention Standards at Big Horm but also offered an alternative, PBNDS. which was updated in 2020 and is a more detailed, outcomes-based requirements designed to raise consistency and accountability in detainee care and facility operations.

**37.** On July 13, 2026, GEO announced it had entered into a five-year support services contract with ICE for the activation of a federal immigration detention facility in Hudson. GEO expects the contract to generate approximately $85 million in annual revenues, excluding transportation revenues. The contract is worth up to $528.6 million.

**38.** The facility was built in 2009. From approximately 2009 to 2013, the facility was used to incarcerate Alaska state convicts while Alaska was building a new penitentiary. GEO leased the facility from Highlands REIT and operated the facility during this time. Since approximately 2013, the facility has been dormant.

---

[2] At the time ICE entered into the final contract with GEO Group for long term operations at Big Horn, the acting director of ICE was a former employee of GEO.

**39.** The facility can house 1,256 detainees. But Highlands REIT told ICE that it could increase the number of people it detains at Big Horn by adding bunking to its oversized dayrooms. Highlands REIT also owns 37 acres adjacent to the facility and has already received a conditional use permit for a 1,000-bed expansion on that site.

**40.** At the "request for information" stage, ICE received information about alternative locations. These alternative facilities are in areas without severe air pollution problems, with access to water supplies not from sources in crisis, like the Colorado River, are served by wastewater treatment plants without a long history of violations and without the current ability to comply with its water pollution limits, and are not in small towns without adequate roads and access to avoid horrific traffic**.** ICE failed to evaluate these alternative facilities under NEPA.

41. ICE is responsible for the detention, health, welfare, transportation, and deportation of aliens in removal proceedings, and those subject to a final order of removal from the U.S. Big Horn is a US ICE Enforcement and Removal Operations (ERO) Contract Detention Facility.

42. GEO is ICE's "vendor". GEO is the owner operator.

43. The immigrants at Big Horn are in "ICE Custody".

***IMPACTS AND HARMS CAUSED BY BIG HORN***

**44.** Big Horn will cause a variety of significant adverse environmental impacts. These include the spread of infectious disease and inadequate health care, air pollution, water pollution, source water, traffic, emergency services, hazardous waste, and harm to wildlife. Below, we discuss some of these in more detail.

**COMMUNICABLE DISEASES AND HEALTH CARE FOR DETAINEES:**

**45.** Heightened risks of infectious disease transmission and outbreaks are reasonably foreseeable as a result of the design and operation of Big Horn. Immigrant detention facilities are inherently at high risk of infectious disease, both for people inside the facility and for the outside community. Furthermore, immigration detention facilities are characterized by overcrowding, suboptimal sanitation, and poor ventilation, creating environments ripe for the rapid spread of infectious diseases. A recent epidemiological study of ICE facilities managed by the ICE Health Service Corps found sustained outbreaks of vaccine-preventable diseases, including 2,035 cases of influenza, 486 cases of hepatitis A, and 252 cases of mumps between 2019 and 2023 across 20 facilities.

**46.** The risk of exposure to tuberculosis, a contagious and potentially fatal bacterial disease, is particularly acute in these high-density facilities. While congregated settings are at especially high risk of tuberculosis outbreaks, because of the number of individuals living in an enclosed space, immigration detention facilities are at an even higher risk as they often house detainees who recently traveled from countries with an increased prevalence of tuberculosis. Tuberculosis is an airborne, communicable disease and is highly contagious if untreated.

**47.** On June 21, 2026, public health officials confirmed tuberculosis exposure in one patient at the Denver Contract Detention Facility, also known as the Aurora ICE Processing Center, which is located in Aurora, Colorado and operated by GEO Group. While only one case has been confirmed, advocates and detainees have reported a wider outbreak involving at least 12

people. As of this complaint, GEO Group has refused to cooperate with local health authorities regarding the tuberculosis exposure, leading to the Colorado Department of Public Health and Environment issuing a public health order addressed to GEO Group demanding information regarding the exposure.

**48.** On June 25, 2026, the Adams County Health Department issued a public health order to GEO Group regarding its Aurora Facility. The Order required GEO Group to provide information and access to the facility.

**49.** GEO Group originally provided some cooperation pursuant to the public health order but around July 1, 2026, GEO Group stopped communicating with Adams County public health and requested that all communications be directed through its lawyers. After that point GEO Group provided no meaningful information.

**50.** In light of the above and the worsening of the situation, Colorado Department of Public Health and the Environment ("CDPHE") issued a letter on July 14, 2026 to GEO Group and two employees requesting information and access to investigate. Even after the Governor of Colorado got directly involved, GEO Group did not provide the necessary access and information to address the situation. Thus, on August 13, 2026, CDPHE issued Public Health Order 26-02 to GEO Group. Thus, on August 19, 2026, CDPHE filed a lawsuit against GEO Group in Adams County District Court seeking injunctive relief. CDPHE filed a motion for a preliminary injunction the next day.

51. The need for this lawsuit and preliminary injunction motion seems to be consistent with GEO Group's history of blocking Congressional oversight at the Aurora GEO Detention Facility. It also seems consistent with GEO Group suing to stop state laws which allow for

inspections of ICE Detention Facilities run by GEO to protect public health. *See e.g. The GEO Group v. Newson*, 2:24-cv-2924 (E.D. Cal June 10, 2025) Dkt. # 38 Order Dismissing Action (GEO preliminary injunction denied and complaint dismissed for lack of standing in case challenging California law to allow public health inspections); *GEO Group, Inc. v. Ferguson*, C23-5626 BHS (July 9, 2026 W.D. Wash.) Dkt. # 95, Order at 27-28 (granting State of Washington's preliminary injunction so that health inspectors can enforce state public health law at GEO run ICE detention facility).

**52.** These public health risks extend beyond the facility. Staff members and contractors enter and exit detention facilities daily, as well as detainees being released or transferred regularly. The risk of disease exposure affects the broader community. Between June and August 2026, over 200 people were released from the Aurora ICE Processing Center with the confirmed tuberculosis exposure. Of those released, more than 120 were local to the area. Many of those individuals may have been exposed but not properly screened before entering the general populace. In addition, over 400 people work at the facility who come and go from the facility routinely.

**53.** Death rates in detention facilities have reached a 22-year high in 2026, exceeding the COVID-19 era spike. The January 2025 to January 2026 annual mortality rate for ICE detainees was 140% higher compared to the previous year. Physicians attribute this spike to systemic weaknesses in medical care, mental health protection, and mortality review. Research on this issue indicated that only 13% of detention center deaths occurred in medical facilities and further found that 49% of deaths were listed as "undetermined or unclassified." Medical needs of detainees are being overlooked and untreated, leading to outbreaks of preventable diseases and deaths.

54. The Town of Hudson is responsible for providing emergency response coordination and Fire and EMS Services to Big Horn.

**AIR POLLUTION:**

**55.** Big Horn is located in the Denver Metro/North Front Range area which has a severe, long-standing problem with ozone. Big Horn will contribute pollution, making the ozone pollution problem worse.

**56.** Ozone is a colorless gas, which exists both at the ground level and in Earth's upper atmosphere. Ozone at the ground level is considered an air pollutant, which is harmful to breathe, and it also damages crops, trees, other vegetation such as wildflowers, and wildlife including birds and pollinators like bumble bees. Additionally, it is the main ingredient in urban smog. However, ozone high in the earth's atmosphere (the stratosphere) creates a layer that protects life on Earth from the sun's harmful ultraviolet rays.

**57.** Ground-level ozone is created by chemical reactions between ozone precursors: nitrogen oxides ("NOx") and volatile organic compounds ("VOCs"), in the presence of sunlight. Thus, it is generally a regional pollutant, where adverse impacts occur many miles away from where the emissions of NOx and VOCs occur.

**58.** NOx and VOCs are emitted by a variety of sources such as diesel burning generators, "natural gas" burning space heating equipment, and fossil fuel burning vehicle exhaust including from cars, trucks, vans, buses, and airplanes.

**59.** Inhaling ozone can trigger a variety of dangerous health problems for humans, including chest pain, coughing, throat irritation, and mortality. Furthermore, it can worsen bronchitis, emphysema, and asthma. In addition, breathing ozone can reduce lung function and inflame the linings of the lungs.

**60.** Children, the elderly, people with existing respiratory illness, and people who work or exercise outside are especially at risk of adverse health outcomes from exposure to ozone. Children are at an increased risk from ozone exposure because their lungs are still developing and because they tend to breathe more, by volume, relative to their body mass, than adults. Ozone may also reduce the immune system's ability to fight off bacterial infections in the respiratory system. Additionally, the United States Environmental Protection Agency's ("EPA") Integrated Science Assessment concluded that the relationships between short-term exposures to ground-level ozone and both mortality and cardiovascular effects are likely to be causal. The Integrated Science Assessment also determined that the currently available evidence suggests causal relationships with short-term (central nervous system effects) and long-term (cardiovascular effects, reproductive and developmental effects, central nervous system effects and total mortality) exposures to ground level ozone. Studies have consistently linked short-term increases in ground-level concentrations with lung function decrements in diverse populations and life stages, including children attending summer camps, adults exercising or working outdoors, and groups with pre-existing respiratory diseases such as asthmatic children.

**61.** The impacts from air pollution, including ozone, have tremendous economic impact. For example, the 2015 ozone national ambient air quality standard has an upper bound annual **net** economic benefit beginning in 2025 of up to $5.3 billion in 2011 dollars.[3]

**62.** EPA has set several, progressively more protective, national ambient air quality standards for ozone, including in 1997, 2008, and 2015. However, "more ozone is more ozone, and there is no 'threshold concentration below which' ground-level ozone is 'known to be harmless.' *Am. Trucking Ass'ns, Inc. v. EPA*, 283 F.3d 355, 360 (D.C. Cir. 2002)[.]" *Clean Wisconsin v. EPA*, 964 F.3d 1145, 1158 (D.C. Cir. 2020). In other words, individuals can and do suffer adverse effects from air pollutants, including ozone but also including nitrogen oxides and particulate matter, when the pollutants are at levels below the national ambient air quality standards. These standards are policy judgments about acceptable risk of harm; not no harm. *Mississippi v. EPA*, 744 F.3d 1334, 1342 – 1343 (D.C. 2013).

**63.** So, for example, EPA set the 2015 ozone national ambient air quality standard at 70 parts per billion ("ppb"). This resulted in an upper bound total health benefit of $8 billion.[4] But if the standard had been set at the more protective level of 65 ppb, there would have been such a dramatic decrease in illness and death such that the upper bound total health benefit would have

---

[3] EPA, Reviewing National Ambient Air Quality Standards – Scientific and Technical Information (Mar. 4, 2016), Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone, at ES-15, ES-18.
[4] EPA, Reviewing National Ambient Air Quality Standards – Scientific and Technical Information (Mar. 4, 2016), Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone, at ES-15, ES-18.

been $34.2 billion.[5] Furthermore, EPA's Clean Air Scientific Advisory Committee recommended, based on its review of the scientific literature, that the 2015 standard be set in the range of 60 to 70 ppb with a preference of the standard in the low end of the range.[6] But the Clean Air Scientific Advisory Committee noted that the level of the national ambient air quality standard is a policy judgment left up to the EPA administrator.

**64.** EPA designates areas as either exceeding a national ambient air quality standard, which is referred to as a nonattainment area, or as not exceeding a national ambient air quality standard, which is referred to as an attainment area. Nonattainment areas must submit state implementation plans ("SIP") to bring the area into attainment by a set attainment date. For ozone, nonattainment areas are given one of five designations based on the severity and length of the nonattainment problems. These levels are marginal, moderate, serious, severe, and extreme. If an area fails to attain the national ambient air quality standard by its attainment date, EPA downgrades the area to the next stringent level, which results in a requirement for additional emission reductions.

**65.** For almost 20 years the Metro Denver/North Front Range area, in which Big Horn is located, has been nonattainment for ozone because of its violations of the national ambient air quality standards for ozone. In November 2007, EPA designated Metro Denver/North Front Range a marginal nonattainment area for the 1997 ozone national ambient air quality standard. In 2012,

---

[5] EPA, Reviewing National Ambient Air Quality Standards – Scientific and Technical Information (Mar. 4, 2016), Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone, at ES-15, ES-18.
[6] Amanda Reilly, *EPA Defends New Ozone Standard as Green Allies Fume,* Environment & Energy Publishing, Oct. 2, 2015, *available at* http://www.eenews.net/stories/1060025767.

EPA designated Metro Denver/North Front Range a marginal nonattainment area for the 2008 ozone national ambient air quality standard. EPA set the attainment date for July 2015. The area failed to attain so EPA had to downgrade the area to a moderate nonattainment area with an attainment date of July 20, 2018. The area again failed to attain by that date, so EPA had to again downgrade the area to a serious nonattainment area with an attainment date of July 20, 2021. The area again failed to attain by that date, so EPA had to again downgrade the area to a severe nonattainment area with an attainment date of July 20, 2027.

**66.** Although July 20, 2027 has not arrived yet, we already know that the area failed to attain by this date because the determination of attainment will be based on ozone levels from 2024 to 2026. Having been given four chances to come into compliance with the 2008 ozone standard and having failed four times, the Clean Air Act will impose some significant new requirements. For example, each major source of ozone precursor pollution must reduce its emissions by 20% or a fee of over $11,000 per ton of pollution per year. The only way to avoid this fee provision is for the Metro Denver/North Front Range to finally come into compliance with the 2008 ozone national ambient air quality standard. Obviously, adding more emissions of ozone precursor pollution is not an effective strategy to come into compliance with the 2008 ozone national ambient air quality standard.[7]

---

[7] Denver Metro/North Front Range is also nonattainment for the more protective 2015 ozone national ambient air quality standard, which is implemented independent of the 2008 standard. Colorado has similarly history of failure, with EPA having to downgrade that area from marginal to moderate in 2022 and moderate to serious in 2024. The serious area attainment date is August 3, 2027 but because the determination of whether the area attained will be based on 2024 to 2026 ozone levels, we already know that EPA will have to down grade Denver Metro/North Front Range to severe nonattainment for the 2015 ozone national ambient air quality standard as well.

**67.** Yet, that is exactly what Defendants propose to do. Big Horn will emit ozone precursor pollution from smokestacks at the Facility like its diesel burning generator. It will also induce travel from vehicles that emit ozone precursor pollution like the ones that will move detainees to and from the facility, as well as workers, service providers for detainees like immigration lawyers and religious officiants, and family and friends coming to visit. It will also include deliveries of supplies to feed and care for a population that could total almost as many people as the Town of Hudson itself. These emissions will come from cars, trucks, buses, and vans.

**68.** They will also come from aircrafts which ICE controls via contracts or otherwise. Defendants determined that proximity to an airport was a component of this project. Deportation outside of the United States is the goal and responsibility of this project.

**69.** Ozone is not the only air pollutant Big Horn will produce. There are also nitrogen oxides ("NOx"), which in addition to being a precursor to ozone and fine particulate matter, is also a harmful pollutant in its own right for which EPA has set its own national ambient air quality standard. NOx can irritate the airways in the human respiratory system. Short exposures, measured in minutes rather than hours or days, can aggravate respiratory disease, in particular asthma. This can lead to hospital admissions and emergency room visits. Longer term exposures may contribute to the development of asthma.

**70.** NOx emissions also contribute to acid deposition, including acid rain. Acid deposition from emissions which originate in Weld County, where the Town of Hudson is, adversely impact high elevation vegetation, including wildflowers, in Rocky Mountain National Park.

**71.** Big Horn will emit NOx emissions from the fossil fuel burning equipment on site such as the diesel burning generator, stoves and ovens, and space and water heating devices. In addition, the induced travel via cars, trucks, buses, vans, and aircraft will emit NOx.

**72.** Furthermore, there is particulate matter, which is classified in the regulatory setting as measuring 10 micrometers or less ("PM10") or 2.5 micrometers or less ("PM2.5"). PM2.5 kills people. There is no known threshold level below which there are no adverse health effects, including premature mortality for PM2.5.

**73.** Like NOx, PM10 and PM2.5 emissions will come from fossil fuel burning equipment on the Big Horn site and vehicle emissions. In addition, vehicles cause PM10 and PM2.5 emissions from dust on the roads and parking lots at Big Horn being re-entrained as vehicles drive over it. This is particularly problematic as the road becomes a dirt road immediately to the north of Big Horn. A dirt road in a dry climate like the Town of Hudson generates a lot of particulate matter. The wearing down of brake pads during the normal operations of vehicles is also a source of PM2.5 and PM10 emissions.

**74.** The Clean Air Act allows, but does not require, that states can establish a program to regulate and reduce air emissions from "indirect sources," that is facilities which induce a significant amount of vehicle travel and thus vehicle pollution like Big Horn. Colorado has chosen not to establish an indirect source permitting program. Thus, NEPA provides the only regulatory mechanism to get precise information about Big Horn's induced traffic emissions.

**75.** Defendants should have evaluated all of these air pollution emissions in a NEPA analysis. There are many alternatives to consider and mitigation measures to evaluate with regard to ozone, NOx, and particulate matter air pollution.

**WASTEWATER:**

76. Big Horn discharges its wastewater into the Town of Hudson wastewater treatment plant. Both Big Horn and the Town of Hudson have a long history of Clean Water Act violations when it comes to their discharges of wastewater.

77. On June 24, 2014, EPA and GEO Group entered into a Combined Complaint and Consent Agreement, Docket No. CWA-08-2014-0025. EPA found that GEO Group's discharge from what was then called the Hudson Correctional Facility of oil and grease resulted in inhibition of/disruption of the treatment process at Town of Hudson's wastewater treatment plant. The Town of Hudson incurred costs totaling $65,008 for extraordinary direct expenses in managing the grease discharged as a result of the excess grease entering the Town of Hudson's wastewater treatment plant from GEO's Hudson Correctional Facility. The Town of Hudson also violated its total suspended solids % removal, total suspended solids daily, and ammonia (also referred to as nitrogen) monthly Clean Water Act limits during the months of October 2010 and January through April 2011 as a results of the interference caused by GEO's Hudson Correctional Facility's discharges into the Town of Hudson's wastewater treatment plant. EPA found that GEO's wastewater discharges constituted violations of 40 C.F.R. § 403.5(a)(1) and 33 U.S.C. § 1317(b)(1). EPA fined GEO $6,250 and made GEO pay an additional $18,822.55 towards a supplemental environmental project.

78. In addition to the past problems with oil and grease, the Town of Hudson has explained that "[b]ecause of the amount and type of contraband, chemicals, drugs, and other

harmful substances, the Hudson Correctional Facility will need to participate in Hudson's industrial pretreatment program to protect the biological processes at the wastewater treatment facility. The Hudson Correctional Facility has some pretreatment capabilities to address peak flows and debris, but the facility has remained vacant since 2013. Over the past 13 years, CDPHE has issued more stringent permit limitations for the Town's WWTF. Furthermore, as documented in Section 3.3.2, the WWTF peak hydraulic flows and organic loads are consistently exceeding the WWTF's current capacity. Additional industrial pretreatment at the Hudson Correctional Facility will assist the Town in complying with the more stringent CDPHE requirements issued on November 26, 2024." However, there is no indication that Big Horn is currently equipped to conduct this additional industrial pretreatment or has any plans to do so.

79. The Town of Hudson's wastewater treatment plant suffers from "deferred maintenance". The Town of Hudson described its wastewater infrastructure as suffering from a "deteriorating state".

80. The Town of Hudson's wastewater treatment plant has a long history of violating its Clean Water Act permit. In other words, for a long time, this facility has illegally discharged water pollution. A subset of the Town of Hudson's illegal water pollution discharges is as follows:

**Numeric Violations:**

**Description**:

| | |
|---|---|
| 09/30/2024 | Biological Oxygen Demand ("BOD"), 5-day, 20 degree ("deg.") Celsius ("C") 30 Day Average ("DA AVG") |

| | |
|---|---|
| 09/30/2024 | BOD, 5-day, 20 deg. C Maximum seven-day average ("MX 7D AV") |
| 06/30/2024 | BOD, 5-day, 20 deg. C MX 7D AV |
| 06/30/2024 | Solids, total suspended 30DA AVG |
| 06/30/2024 | Solids, total suspended MX 7D AV |
| 06/30/2024 | Nitrogen, ammonia total [as N] 30DA AVG |
| 06/30/2024 | Nitrogen, ammonia total [as N] DAILY Maximum ("MX") |
| 06/30/2024 | Solids, suspended percent removal MO AV MN |
| 02/29/2024 | BOD, 5-day, 20 deg. C MX 7D AV |
| 02/29/2024 | Nitrogen, ammonia total [as N] 30DA AVG |
| 02/29/2024 | Nitrogen, ammonia total [as N] DAILY MX |
| 01/31/2024 | Nitrogen, ammonia total [as N] 30DA AVG |
| 01/31/2024 | Nitrogen, ammonia total [as N] DAILY MX |
| 12/31/2023 | Nitrogen, ammonia total [as N] 30DA AVG |
| 12/31/2023 | Nitrogen, ammonia total [as N] DAILY MX |
| 09/30/2023 | Solids, total suspended MX 7D AV |
| 09/30/2023 | Solids, suspended percent removal MO AV MN |
| 07/31/2023 | Solids, suspended percent removal MO AV MN |
| 04/30/2023 | Solids, total suspended 30DA AVG |
| 04/30/2023 | Solids, total suspended MX 7D AV |
| 04/30/2023 | Nitrogen, ammonia total [as N] 30DA AVG |

| | |
|---|---|
| 04/30/2023 | *E. coli* MX 7D GM |
| 04/30/2023 | Solids, suspended percent removal MO AV MN |
| 03/31/2023 | pH MINIMUM |
| 02/28/2023 | pH MINIMUM |
| 02/28/2023 | Solids, total suspended 30DA AVG |
| 02/28/2023 | Solids, total suspended MX 7D AV |
| 02/28/2023 | Nitrogen, ammonia total [as N] 30DA AVG |
| 02/28/2023 | Nitrogen, ammonia total [as N] DAILY MX |
| 01/31/2023 | Solids, total suspended 30DA AVG |
| 01/31/2023 | Solids, total suspended MX 7D AV |
| 01/31/2023 | Nitrogen, ammonia total [as N] 30DA AVG |
| 01/31/2023 | Nitrogen, ammonia total [as N] DAILY MX |
| 01/31/2023 | *E. coli* MX 7D GM |
| 12/31/2022 | pH MINIMUM |
| 12/31/2022 | Solids, total suspended MX 7D AV |
| 08/31/2022 | pH MINIMUM |
| 12/31/2021 | Solids, total suspended MX 7D AV |
| 11/30/2021 | Solids, total suspended 30DA AVG |
| 11/30/2021 | Solids, total suspended MX 7D AV |
| 11/30/2021 | *E. coli* MX 7D GM |
| 11/30/2021 | Solids, suspended percent removal MO AV MN |

| | |
|---|---|
| 10/31/2021 | Solids, total suspended 30DA AVG |
| 10/31/2021 | Solids, total suspended MX 7D AV |
| 10/31/2021 | Solids, suspended percent removal MO AV MN |
| 09/30/2021 | Nitrogen, ammonia total [as N] 30DA AVG |
| 09/30/2021 | Nitrogen, ammonia total [as N] DAILY MX |
| 08/31/2021 | Nitrogen, ammonia total [as N] 30DA AVG |
| 08/31/2021 | Nitrogen, ammonia total [as N] DAILY MX |
| 07/31/2021 | Solids, suspended percent removal MO AV MN |
| 06/30/2021 | Solids, total suspended MX 7D AV |
| 06/30/2021 | *E. coli* MX 7D GM |
| 06/30/2021 | Solids, suspended percent removal MO AV MN |
| 04/30/2021 | Nitrogen, ammonia total [as N] 30DA AVG |
| 04/30/2021 | Nitrogen, ammonia total [as N] DAILY MX |
| 03/31/2021 | Solids, total suspended 30DA AVG |
| 03/31/2021 | Solids, total suspended MX 7D AV |
| 03/31/2021 | Nitrogen, ammonia total [as N] 30DA AVG |
| 03/31/2021 | Nitrogen, ammonia total [as N] DAILY MX |
| 03/31/2021 | Solids, suspended percent removal MO AV MN |
| 02/28/2021 | Solids, total suspended 30DA AVG |
| 02/28/2021 | Solids, total suspended MX 7D AV |
| 02/28/2021 | Nitrogen, ammonia total [as N] 30DA AVG |

| | |
|---|---|
| 02/28/2021 | Nitrogen, ammonia total [as N] DAILY MX |
| 02/28/2021 | Solids, suspended percent removal MO AV MN |
| 01/31/2021 | Solids, total suspended 30DA AVG |
| 01/31/2021 | Solids, total suspended MX 7D AV |
| 01/31/2021 | Nitrogen, ammonia total [as N] 30DA AVG |
| 01/31/2021 | Nitrogen, ammonia total [as N] DAILY MX |
| 01/31/2021 | Solids, suspended percent removal MO AV MN |
| 03/31/2020 | Solids, total suspended 30DA AVG |
| 03/31/2020 | Solids, total suspended MX 7D AV |
| 10/31/2019 | Solids, total suspended MX 7D AV |
| 06/30/2019 | *E. coli* MX 7D GM |
| 01/31/2019 | *E. coli* MX 7D GM |
| 12/31/2018 | Nitrogen, ammonia total [as N] 30DA AVG |
| 12/31/2018 | Nitrogen, ammonia total [as N] DAILY MX |
| 12/31/2018 | *E. coli* MX 7D GM |
| 11/30/2018 | Nitrogen, ammonia total [as N] 30DA AVG |
| 11/30/2018 | Nitrogen, ammonia total [as N] DAILY MX |
| 08/31/2018 | Solids, total suspended MX 7D AV |
| 02/28/2017 | Solids, total suspended 30DA AVG |
| 02/28/2017 | Solids, suspended percent removal MO AV MN |
| 01/31/2017 | Solids, suspended percent removal MO AV MN |

| | |
|---|---|
| 12/31/2016 | *E. coli* MX 7D GM |
| 11/30/2016 | Solids, total suspended 30DA AVG |
| 11/30/2016 | Solids, suspended percent removal MO AV MN |
| 12/31/2015 | Nitrogen, ammonia total [as N] 30DA AVG |
| 12/31/2015 | Nitrogen, ammonia total [as N] DAILY MX |
| 06/30/2015 | Solids, suspended percent removal MO AV MN |
| 05/31/2015 | Solids, suspended percent removal MO AV MN |
| 03/31/2015 | Nitrogen, ammonia total [as N] 30DA AVG |
| 03/31/2015 | Nitrogen, ammonia total [as N] DAILY MX |
| 02/28/2015 | Nitrogen, ammonia total [as N] 30DA AVG |
| 02/28/2015 | Solids, suspended percent removal MO AV MN |
| 12/31/2014 | Solids, total suspended MX 7D AV |
| 12/31/2014 | *E. coli* MX 7D GM |
| 12/31/2014 | Solids, suspended percent removal MO AV MN |
| 11/30/2014 | Solids, suspended percent removal MO AV MN |
| 10/31/2014 | *E. coli* MX 7D GM |
| 11/30/2013 | *E. coli* MX 7D GM |

81. This list is only a subset of the Town of Hudson's illegal water pollution discharges for a few reasons. These are only the Town of Hudson's self-reported numeric violations from November 30, 2013 to September 30, 2024. There are additional violations that the Colorado

Department of Public Health and the Environment ("CDPHE") discovered during its very occasional inspections of the Town of Hudson's wastewater treatment plant. For example, during an August 21, 2024 inspection CDPHE had 3 violations that it classified as "major findings" and 3 other observations and recommendations. The first major violation was improper operation and maintenance. Specifically, the Town of Hudson could not show proof of its device which measures how much wastewater is coming in and being discharged out of its wastewater treatment plant. This is absolutely critical, for example, because in order to know the volume of chemicals to add to the water to treat the waste, one needs to know the volume of wastewater to be treated.

82. Things have only continued to get worse in terms of the wastewater discharges from Big Horn. Effective December 1, 2024, CDPHE issued the Town of Hudson's wastewater treatment plant a new Clean Water Act water pollution permit, which has a certification number of COG591104. The new permit has more stringent discharge limits, as well as new limits and requirements for new pollutants such as PFAS, which are commonly referred to as "forever chemicals" because they do not breakdown.

83. Construction work appears to be necessary for the Town of Hudson's wastewater treatment plant in order for it to comply with one of its emission limits, Total Inorganic Nitrogen. However, the new permit does not require this construction to be completed until May 31, 2029, meaning that Big Horn could be sending its sewage to a treatment plant which cannot adequately clean it up for years.

84. The new permit is, however, missing some requirements such as one for cadmium, a toxic heavy metal, which is classified as a human carcinogen linked to prostate and lung cancer. The World Health Organization says that exposure to cadmium is a major public health concern.

Yet, the Town of Hudson's wastewater treatment plant water pollution permit does not contain a limit for discharge of this toxic heavy metal because CDPHE has not gotten around to setting a total maximum daily load for the creek that the Town of Hudson discharges into. CDPHE has said after it gets around to setting a total maximum daily load for cadmium, it will set an individual limit and put it in the Town of Hudson's Clean Water Act permit.

85. Perhaps an even bigger problem is that on March 24, 2025, CDPHE provided notice to the Town of Hudson that CDPHE would not be taking any enforcement actions until further notice for violations of the Town of Hudson's new Clean Water Act permit. CDPHE refers to this as an enforcement discretion letter. In fact, CDPHE said it was letting the Town of Hudson off the hook from even having to report if its pollution levels violated the limits in the new permit. Then on June 12, 2026, CDPHE issued a second "get out of jail free" card. This one was specific to violations of any requirements regarding the temperature of the discharged water. Thus, a NEPA analysis of wastewater discharges from Big Horn is absolutely essential in this context in which Big Horn's wastewater could be inadequately treated or even, in a worst case scenario, be raw sewage from 1500 or so people being dumped into Colorado's waterways.

**WATER SUPPLY:**

86. The original Conditional Use Permit from 2008 that the Town of Hudson issued when the facility was going to hold people incarcerated by the State of Alaska required that the applicant for the Conditional Use Permit supply the Town with additional and sufficient raw water to serve the inmates housed in the correctional facility. However, the requirement has gone

completely by the wayside. The Town of Hudson's Water Supply Master Plan makes no mention of the Defendants, GEO, or Highlands REIT obtaining sufficient water to service the Big Horn Facility. But the Town of Hudson is responsible for providing water to Big Horn. So, the Town of Hudson is totally left to fend for itself when it comes to obtaining a water supply adequate for both the town and the Big Horn Facility.

87. The Town of Hudson does not currently have the adequate water supply to serve Big Horn. In addition, the Town of Hudson's attempts to obtain additional water have run into difficulties.

88. The Town of Hudson currently owns 662 units of Colorado – Big Thompson Project ("CBT") water. CBT takes water from the Colorado River, pumps it across the continental divide, stores it in Carter Lake, then delivers it to the water treatment plant in Fort Lupton, which then delivers treated water to the Town of Hudson.

89. Under ideal conditions, one unit could equal one acre-foot of water. But the western United States, and the Colorado River in particular, are far from under ideal conditions when it comes to available water. So, the operator of the CBT, Northern Water, sets a quota each year which determines what percentage of an acre-foot of water each unit is worth. In November 2025, Northern Water set the quota at 50 percent. This means the Town of Hudson would have only been entitled to 331 acre-feet of water. But in 2021, when what is now called Big Horn was empty, the Town of Hudson by itself used 340 acre-feet of water. Northern Water did revise the quota to 80 percent in April 2026. But if they set the quota at 50% in the past, Northern Water can do so again in the future.

90. Table 1 includes the Town of Hudson's future water demands:

Table 1

| **User** | **Amount in Acre Feet** |
| --- | --- |
| Town of Hudson History High Use | 340 (2021)[8] |
| Big Horn | 230 |
| Hudson Hills Residential Development | 110.5 |
| Pilot Travel Center | 9 |
| Quik Trip | 2.8 |
| Hudson Commercial – Tractor Supply | 5.3 |
| **Total** | **697.6** |

91. 697.6 acre-feet of water in Table 1 is more than the 662 units of CBT water, even in the unlikely event that the quota could be set at 100%. The demand once Big Horn is operational is also more than twice the supply if Northern Water sets the quota at 50% again.

92. There are also other potential major demands for water in the Town of Hudson. For example, at the Request for Information stage of the process, Highlands REIT told ICE that the available beds could be increased by moving beds to the extra large day rooms. Highlands REIT also told ICE that Highlands REIT owns 37 acres immediately adjacent to Big Horn which could allow them to construct additional buildings to hold another 1,000 detainees.

[8] Although not totally clear, it appears that the Town of Hudson relied on its average historical use, rather than the highest actual use, in determining its future demands. Of course, people and businesses need water every year, not just in "average years".

93. Furthermore, the Bandimere Speedway, which closed its operations in Morrison, Colorado, is planning on opening in Hudson, Colorado. The Town of Hudson has already annexed the land into the town for the Speedway.

94. As stated above, the CBT water that the Town of Hudson receives, despite that the town is east of the Continental Divide, comes from the Colorado River. The Colorado River is in crisis in terms of the quantity of water in it. Lake Mead, the largest reservoir in the United States, is a critical storage system for the Colorado River. On August 7, 2026, Lake Mead plummeted to its lowest water levels since it was filled some 90 years ago. Modeling forecasts that water levels will continue to drop through much of the rest of 2026. Lake Powell, the second major reservoir on the Colorado River, is also currently at historic low levels. Not only is this a crisis for the tens of millions of people who depend on Colorado River water, it also is a crisis for wildlife, such as the humpback chub, which is a fish listed under the Endangered Species Act as threatened, as well as the Colorado pikeminnow and bonytail which are listed as endangered. The Endangered Species Act dictates that enough water be left in the Colorado River to avoid driving the humpback chut, and other listed species towards extinction.

95. Colorado, along with the other states that rely on the Colorado River, have failed to reach an agreement on how to share the very limited water still in it. Thus, the Bureau of Reclamation came up with its own plans on how to reduce consumption of Colorado River water. This, along with Endangered Species Act requirements, means that Northern Water's ability to deliver CBT water to the Town of Hudson could be significantly constrained and is decidedly unreliable.

96. The danger to the Town of Hudson's water supply increased when, on August 24, 2026, the State of Nevada sued U.S. Bureau of Reclamation over its plan to address the extreme water shortage in the Colorado River. *See Nevada v. Doug Burgum,* 2:26-cv-2665 (D. Nev. Aug. 24, 2026) Dkt. No. 1 (Complaint). In this case, Nevada complains, among other things, about the U.S. Bureau of Reclamation's failure to impose mandatory reductions on the use of Colorado River water by Colorado and the other upper basin states. *Id.* at 23.

97. The Town of Hudson does also have rights to some alluvial well water. But the math still doesn't work for a reasonable plan with the well water. For example, it is theoretically entitled to 176 acre-feet per year. However, the well water has to be run through a filter, called a reverse osmosis system, in order to be drinkable. The CBT water, at a 50% quota, which was actually imposed last year, plus the 176 acre-feet from the alluvial wells only gets the Town of Hudson to 507 acre-feet, significantly below the projected demand of 697.6 acre-feet. Any quota less than 79% for the CBT water would mean water shortages in the Town of Hudson, including at Big Horn. Furthermore, the reverse osmosis system can only currently process approximately 55 acre -feet. Thus, even at the current quota of 80% for the CBT, total water supply is at 584 acre-feet, which is below the 697.6 acre-feet of demand with Big Horn operational. As the Town of Hudson diplomatically put it: "It became clear in this modeling exercise that water source infrastructure capacity constraints are the immediate problem for Hudson to meet future growth."

98. The Town of Hudson's attempts to acquire additional water have not fared well. For example, the Town of Hudson has purchased water from the Chimney Hollow reservoir, which is not yet operational to the point that it can deliver water to its customers. But Chimney Hollow reservoir has a uranium contamination problem. According to Chimney Hollow's owner, Northern

Water, the average uranium concentrations are 64 micrograms per liter with concentrations more than double, up to 131 micrograms per liter, in certain locations like at the bottom of the reservoir. But EPA's maximum contaminant level for uranium in drinking water is only 30 micrograms per liter. This contamination, coupled with severe or extreme drought Colorado is suffering from, means the water will not be available to consumers, like Big Horn, for five or six more years, according to other potential customers for Chimney Hollow water like the Town of Erie.

**TRAFFIC:**

99. Big Horn will increase local traffic, road access problems, and road safety burdens. Big Horn will likely result in noticeably increased traffic in the area from (1) movement of detainees to and from the facility; (2) staff and contractor commuting to and from work at the facility; (3) delivery trucks dropping off food, materials, and other supplies to the facility; and (4) visits to the facility from friends, family, legal counsel, and clergy exercising their right to visit detainees.

100. Speaking at a "Border Security Expo" in Phoenix, Arizona, in April 2025, Acting ICE Director Todd Lyons explained that ICE would begin "treating [deportation] like a business," altering its deportation practices to function "like [Amazon] Prime, but with human beings."[9]

[9] Jerod Macdonald-Evoy, ICE Director Envisions Amazon-Like Mass Deportation System: 'Prime, but with Human Beings', Ariz. Mirror (Apr. 8, 2025), https://azmirror.com/2025/04/08/ice-director-envisions-amazon-like-mass-deportationsystem-prime-but-with-human-beings (quoting Acting ICE Director Todd Lyons) (last accessed Apr. 1, 2026).

Because ICE has failed to do a NEPA analysis, it is not clear if ICE considers Big Horn a regional processing center, in which the average stay would be 3-7 days, or a Large Scale Detention Facility, in which the average stay would be less than 60 days according to Defendants' own documents. In either event, vehicle trips will be much higher than, for example, when this same facility was a prison serving Alaska convicts. In addition, because ICE failed to do a NEPA analysis, the Town of Hudson has not been provided information about transportation patterns or traffic volumes even though it maintains responsibility for local roads and traffic management.

101. The existing transportation infrastructure in the area around Big Horn is noticeably lacking in its ability to support an increase in traffic that would be predicted based on the size and function of Big Horn. As one example, the Hudson off-ramp of "eastbound" Interstate-76 is very limited. Additional traffic induced by Big Horn may cause backups with vehicles trying to exit I-76 fully stopped in the travel lane of eastbound I-76.

102. This increased traffic will have adverse effects not only for travel times, but will also likely increase accidents, increase noise, negatively impact businesses in Hudson, increase air pollution, interfere with emergency response vehicles, and increase injury and mortality to wildlife such as black-tailed prairie dogs, a keystone species, and deer.

103. As part of a NEPA analysis, and also independent of NEPA, Defendants should have conducted a traffic study to determine if the additional traffic is enough to result in a need for major improvements. Defendants also should have done an analysis to support a Colorado Department of Transportation Access Permit which would cover any necessary improvements to State Highway ("SH") 52. The analysis would also support a potential Federal Highway Administration Access Request for any impacts to, or improvements needed, at the I-76/SH 52

interchange. No Colorado Department of Transportation Access permit or Federal Highway Administration Access Request has been submitted.

**HAZARDOUS MATERIALS AND WASTE:**

104. Plaintiffs are not aware of any information about hazardous materials and waste at Big Horn. For the ICE Detention Facility known as "Alligator Alcatraz" the Florida Department of Emergency Management had a draft Environmental Assessment prepared. That draft Environmental Assessment had a section on hazardous materials and waste. In that section, it explained that there was a Phase 1 Environmental Site Assessment completed for that facility. It identified a recognized environmental condition, that is the removal of underground storage tanks without documentation of potential soil or groundwater impacts from the tanks. A copy of the Phase I Environmental Site Assessment was attached as an appendix to the draft Environmental Assessment.

105. No similar information is publicly available regarding Big Horn.

**WILDLIFE & NATIVE VEGETATION:**

106. Big Horn will have numerous adverse impacts on wildlife and native vegetation. This ranges from black tailed prairie dogs getting run over by the dramatic increase in vehicles going to and from Big Horn to water pollution ending up in the Platte River which is used by the federally listed Whooping Crane.

107. The air pollution discussed above adversely impacts numerous species. For example, quaking aspen, shadbush, spreading dogbane, wild sarsaparilla, prairie sage, western hazel, bush honeysuckle, balsam poplar, shining and scouler's willow, and Canada and giant goldenrod are all present in Rocky Mountain National Park and are all sensitive to damage from ozone pollution, according to the National Park Service.

108. The problem extends beyond air pollution injuring individual species. NOx deposition can lead to the alteration of species richness, composition and biodiversity in terrestrial ecosystems, increased susceptibility to severe fires, drought, and wind damage and to alteration in plant productivity, potentially leading to shifts in population dynamics, species composition, community structure, and even in ecosystem type.

109. The light pollution from Big Horn, having its high intensity security lights on all night long, also adversely impacts wildlife. Scientific evidence suggests that artificial light at night has negative and deadly effects on many organisms, including amphibians, birds, mammals, insects, and plants.

110. Big Horn's inability to adequately address communicable disease also injuries wildlife. The virus which causes Covid-19 can spread from humans to wildlife. Increased human activity in an area, such as Big Horn, increases the risk of transmission of this virus from humans to wildlife.

**LACK OF PUBLIC PARTICIPATION AND INPUT:**

111. The United States Senators for Colorado, John Hickenlooper and Michael F. Bennet, as well as U.S. House Representative Brittany Pettersen sent a letter to Defendants strongly opposing plans for the Big Horn Facility. The elected officials stated that:

> The GEO Group and ICE have a demonstrated history of blocking Congressional oversight of the Aurora GEO Detention Facility by refusing Members of Congress access to the facility, withholding answers to oversight questions, and failing to respond to Congressional casework inquiries. There is no reason to believe that these illegal actions will not be continued in the Big Horn Facility.

112. While the Town of Hudson is responsible for providing local roads and traffic management, water and wastewater services, emergency response coordination, and fire and EMS services, on July 13, 2026 the Town stated that it still did not know the confirmed operational timeline, the number of detainees or facility staff, transportation patterns or traffic volumes, utility demand projects or medical or emergency services coordination needs. If ICE had complied with NEPA and prepared an environmental impact statement or environmental assessment before deciding to move forward with Big Horn and enter into contracts with GEO, the Town of Hudson would have had the information listed above to be able to provide the services and infrastructure it is required to provide to Big Horn.

113. In August of 2025, the Hudson Town Manager said that no one from the Federal Government had confirmed to city leadership that the facility was going to be an ICE Detention Facility.

114. Members of the public submitted numerous comments to the Town of Hudson Town Council regarding Big Horn. These included comments about emergency response, EMT

planning, and general municipal impacts. The Town Council said it did not have authority over Big Horn. However, these comments would be relevant to a NEPA analysis.

115. In contrast, consistent with DHS own Directive 023-0 l Rev 01, *Implementation of the National Environmental Policy Act,* and Instruction 023-01-001-01 Rev 01, the *Environmental Assessment (EA) For the Proposed Contract Detention Facility in the Houston, Texas Area of Operations* was made available for public review and comment for a period of thirty days. The same was true for the Environmental Assessment for the ICE El Paso Processing Center.

## <u>CLAIM</u>

## COUNT I

## (VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT (NEPA AND APA))

116. Plaintiffs reallege the Common Allegations as if fully set forth herein.

117. The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, requires federal agencies to prepare an Environmental Impact Statement (EIS) for any major federal action significantly affecting the quality of the human environment, or an Environmental Assessment (EA) if the agency action does not have reasonably foreseeable significant effects on the human environment, or if the significance of such effect is unknown. The law ensures that the agency and the public are aware of the environmental consequences of proposed projects. Properly applied, NEPA helps agencies to make better decisions and ensure good project management.

118. NEPA applies when a federal agency considers a proposal for a major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(C); *see also* 42

U.S.C. § 4336(b)(1)-(2) (describing levels of environmental review for proposed federal agency action depending on the reasonably foreseeable significant effects of the action).

119. Final agency actions, including NEPA violations underlying those final agency actions, are reviewable under the Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq., which provides that courts shall set aside agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

120. Defendants did not prepare an EIS or EA for Big Horn.

121. An agency is excused from preparing an EA or EIS only if it invokes an appropriate categorical exclusion. Categorical exclusions apply only to actions that the agency "has determined normally does not significantly affect the quality of the human environment within the meaning of [42 U.S.C. §] 4332(2)(C)." 42 U.S.C. § 4336e(1).

122. DHS's policies preclude application of a categorical exclusion where an action "would have significant environmental impacts," "presents the potential for significant environmental impacts," or where "that potential cannot be readily determined."[10] Furthermore, agencies cannot invoke a categorical exclusion after a complaint has been filed as that would be a *post hoc* rationalization and is inadequate as a basis for review. *See Anacostia Watershed Soc'y v. Babbitt*, 871 F. Supp. 475, 481 (D.D.C. 1994); *Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142, 150-51 (D.D.C. 1993).

---

[10] *See* Dep't of Homeland Sec., Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA) at V-5 (Nov. 6, 2014), https://www.fema.gov/sites/default/files/2020-07/fema_dhs_instruction-manual_023-01-001-01.pdf (last accessed Aug. 14, 2026) (hereinafter DHS Instruction Manual).

123. No categorical exclusion from NEPA has been invoked by the Defendants. Nor does any apply.

124. No public notice or hearing has been conducted by Defendants pursuant to NEPA in connection with the Defendants' use of Big Horn. DHS's Instruction Manual and/or NEPA require public involvement in the preparation of an EA or EIS.

125. Defendants' actions and omissions constitute multiple violations of NEPA that are reviewable under the APA.

126. Defendants' final agency actions which were done in violation of NEPA include: (1) Defendants' decision to convert and operate Big Horn as an ICE detention facility; (2) Defendants' decision to enter, and entrance into, a letter contract with GEO Group for the operation of Big Horn, including transportation services; and (3) Defendants' decision to enter into, and entrance into, a contract with GEO Group for support services which GEO Group announced on July 13, 2026 and for transportation services.

127. Defendants have substantial control and responsibility over Big Horn.

128. The construction, renovation, and operations of Big Horn has, and will have, impacts as described above that are reasonably foreseeable significant effects on the quality of the human environment. In the alternative, the construction, renovation, and operations of Big Horn does not have a reasonably foreseeable significant effect on the quality of human environment or the significance of such effects are unknown and the construction, renovation, and operations of Big Horn is not excluded pursuant to one of Defendants' categorical exclusion, another agency's categoric exclusions which Defendants' have adopted pursuant to 42 U.S.C. § 4336c, or any other provision of law.

129. Moreover, NEPA requires that "[p]rior to making any detailed statement," the head of the lead agency "shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." *Id.* § 4332(C). Because actions associated with the authorization, construction, and operation of Big Horn involve creating traffic volumes that I-76 is not capable of handling, at a bare minimum federal law required Defendants consult with the Federal Highway Administration in assessing the environmental impacts of their proposed actions.

130. Defendants have not consulted with the Federal Highway Administration pursuant to NEPA regarding Big Horn.

131. The failure to conduct the required environmental review under NEPA violates federal law and deprives the public and affected stakeholders, including Plaintiffs, of required procedures and environmental protections.

132. NEPA review is important not only for avoiding environmental harm but also because it discloses environmental impacts and includes the consideration of alternatives and mitigation. *See e.g. Roberston v. Methow Valley Citizens Council*, 490 U.S. 332, 351-352 (1989).

133. By violating NEPA in the manner set forth above, Defendants' actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and were taken without compliance with procedure required by law, in contravention of the Administrative Procedure Act. 5 U.S.C. § 706(2). Plaintiffs are therefore entitled to injunctive, declaratory, and remedial relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Declare that Defendants' actions violate NEPA and the APA;

B. Enjoin any further pre-construction activities, construction, conversion, or use of Big Horn unless and until Defendants comply with NEPA;

C. Vacate any ongoing contracts Defendants have entered into regarding construction, conversion, or operation of Big Horn;

D. Award Plaintiffs their attorneys' fees and costs as allowed by law;

E. Grant such other relief as the Court deems just and proper.

Dated: September 21, 2026

Respectfully submitted,

/s/ Robert Ukeiley

Robert Ukeiley (Colorado Bar #26747)
Law Office of Robert Ukeiley
255 Mountain Meadows Road
Boulder, CO 80302
rukeiley@igc.org
720-496-8568

Sam Schneider (Colorado Bar #60927)
Metamorphic Law
3900 E Mexico Ave, Ste 300
Denver, CO 80210
sam@metamorphiclaw.com
720-443-5709

Alexa McKay (Colorado Bar #50759)
Environmental and Animal Defense
501 S. Cherry St. Suite 1100
Denver, CO 80246
amckay@eadefense.org
720-722-0336

Jeremy McKay (Colorado Bar #51433)
Environmental and Animal Defense
501 S. Cherry St. Suite 1100
Denver, CO 80246
jmckay@eadefense.org
720-722-0336

*Counsel for Plaintiffs*

Plaintiffs' Addresses:

GreenLatinos
1919 14th St., Ste. 700
Boulder, CO 80302

Colorado Immigrant Rights Coalition
2525 W. Alameda Ave.
Denver, CO 80219