**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-04629-REB

GREENLATINOS, and
COLORADO IMMIGRANT RIGHTS COALITION,

Plaintiffs,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of the United States Department of Homeland Security,
UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
DAVID J. VENTURELLA, in his official capacity as Acting Director of United States Immigration and Customs Enforcement,
UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT,

Defendants.

---

PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

---

# TABLE OF CONTENTS


INTRODUCTION ........ 3

LEGAL STANDARDS ........ 3

A. REQUIREMENTS TO OBTAIN A PRELIMINARY INJUNCTION ........ 3

B. NEPA ........ 4

FACTS ........ 7

A. THE PROPOSED BIG HORN ICE DETENTION FACILITY ........ 7

B. THE ENVIRONMENTAL IMPACTS OF BIG HORN ........ 10

1. INFECTION DISEASE AND HEALTH CARE ........ 10

2. AIR POLLUTION ........ 15

A. OZONE ........ 15

B. NITROGEN OXIDES (“NOx”) ........ 19

C. PARTICULATE MATTER ........ 20

D. POTENTIAL AIR POLLUTION MITIGATION MEASURES ........ 21

3. WATER POLLUTION ........ 21

4. WATER SUPPLY ........ 23

5. TRAFFIC ........ 24

ARGUMENT ........ 28

A. PLAINTIFFS HAVE STANDING ........ 28

B. PLAINTIFFS ARE VERY LIKELY TO PREVAIL ON THE MERITS ........ 30

C. PLAINTIFFS WILL SUFFER IRREPARABLE INJURY ........ 37

1. PLAINTIFFS FACE IRREPARABLE HARM FROM INFECTIOUS DISEASES ........ 38

2. PLAINTIFFS FACE IRREPARABLE HARM FROM AIR POLLUTION ........ 41

3. PLAINTIFFS FACE IRREPARABLE HARM FROM TRAFFIC ........ 42

4. PLAINTIFFS FACE IRREPARABLE HARM FROM ICE’S PROCEDURAL VIOLATION OF NEPA ........ 43

D. THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR THE PLAINTIFFS ........ 44

E. THE COURT SHOULD REQUIRE ONLY A NOMINAL BOND ........ 47

CONCLUSION ........ 48

## INTRODUCTION

Plaintiffs seek a preliminary injunction enjoining Defendants from conducting any more renovations or construction and from commencing operations of the Big Horn ICE Detention Facility. Despite the fact that Defendants have conducted NEPA analyses in similar situations regarding constructing and operating other ICE detention facilities, Defendants did no such analysis here. Thus, Plaintiffs are very likely to succeed on the merits. Plaintiffs will suffer irreparable harm from the spread of infectious disease, air pollution, and traffic if an injunction does not issue. The balance of harm and public interest favor granting the preliminary injunction to prevent the spread of infectious disease, air pollution, traffic, water pollution, and the reliance of unreliable sources of water at the Big Horn ICE Detention Facility.

## LEGAL STANDARDS

### A. REQUIREMENTS TO OBTAIN A PRELIMINARY INJUNCTION

A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where, as here, the federal government is a party, the final two factors merge. *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020).

B. NEPA

NEPA was designed specifically to ensure that federal agencies do not obscure or ignore the environmental, including public health, consequences of their decisions. Congress enacted NEPA to (1) "prevent or eliminate damage to the environment and biosphere," (2) "stimulate the health and welfare" of all people, and (3) "encourage productive and enjoyable harmony between [humankind] and [the] environment." 42 U.S.C. § 4321. NEPA seeks to accomplish these goals by requiring federal agencies to take a "hard look" at the environmental consequences of their actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citation omitted). Defendant Department of Homeland Security's ("DHS") NEPA Instruction Manual states that environmental effects include those that are "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." Declaration of Samuel Schneider in Support of Plaintiffs' Motion for Preliminary Injunction ("Schneider Dec.") Ex. 1 at II-2.

NEPA ensures that before they act, federal agencies "will have available, and will carefully consider, detailed information concerning significant environmental impacts" and that such information "will be made available to the larger [public] audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Methow Valley Citizens Council*, 490 U.S. at 349. To achieve these twin goals, before undertaking a "major Federal action," an agency must follow one of three paths to comply with NEPA: (1) prepare a robust environmental impact statement

(“EIS”); (2) prepare a more limited environmental assessment (“EA”) and finding of no significant impact; or (3) document invocation of a categorical exclusion. *See* 42 U.S.C. § 4336(b)(1) – (2); *Dep’t of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004).

NEPA requires federal agencies to prepare an EIS if the proposed action raises “substantial questions” as to whether a project “may cause significant degradation of some human environmental factor.” *Ocean Advocates v. U.S. Army Corps of Eng’rs*, 402 F.3d 846, 864–65 (9th Cir. 2005). This requirement “presents a ‘low standard’ that is permissive for environmental challenge,” and accordingly, “plaintiffs need not prove that significant environmental effects will occur.” *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 878-79 (9th Cir. 2022) (citation modified). The standard reflects the fact that without an EIS “there may be little if any information about prospective environmental harms and potential mitigating measures.” *Winter*, 555 U.S. at 23.

When it is uncertain whether a proposed action will have a significant impact on the environment, federal agencies may prepare an EA that provides sufficient evidence and analysis for the agency to determine whether a more detailed EIS is necessary or a finding of no significant impact is justified. 42 U.S.C. § 4336(b)(2).

An EIS or EA must also evaluate mitigation measures. *See Methow Valley Citizens Council*, 490 U.S. at 351-352. The agency must also make the document publicly available for review and comment or for an EA, at least involve the public at the scoping phase. 42 U.S.C. § 4332(C); Schneider Dec. Ex. 1 at V-11.

An agency may forgo preparation of an EIS or EA if it invokes a valid categorical

exclusion before undertaking the proposed action. 42 U.S.C. § 4336(a)(2). A categorical exclusion is "a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment within the meaning of [NEPA]." 42 U.S.C. §§ 4336e(1). "Categorical exclusions, by definition, are limited to situations where there is an insignificant or minor effect on the environment." *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999). Therefore, invoking a categorical exclusion is not proper if there are "extraordinary circumstances" indicating that a particular proposed action "may have a significant environmental effect, necessitating further environmental impact analysis." *Ctr. For Biological Diversity v. Ilano*, 928 F.3d 774, 781 (9th Cir. 2019) (citation modified). Ultimately, "[w]hen an agency decides to proceed with an action in the absence of an EA or EIS" by applying a categorical exclusion, "the agency must adequately explain its decision." *Alaska Ctr. for Env't*, 189 F.3d at 859.

DHS's Instruction Manual provides that a categorical exclusion is only appropriate when an action "[c]learly fits the category described in the [categorical exclusion]," "[i]s not a piece of a larger action," and "[n]o extraordinary circumstances exist." Schneider Dec. Ex. 1 at V-4–V-5. The proposed action must "clearly meet all three conditions" in order to be categorically excluded. *Id.* Furthermore, agencies cannot invoke a categorical exclusion after a complaint has been filed as that would be a *post hoc* rationalization and is inadequate as a basis for review. *See Anacostia Watershed Soc'y v. Babbitt*, 871 F. Supp. 475, 481 (D.D.C. 1994).

Courts review an agency's compliance with NEPA under the Administrative Procedure Act ("APA"). *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1029 (10th Cir. 2023). Failure to comply with NEPA constitutes "final agency action" under the APA. *Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir. 1996).

Under the APA, an agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Where, as here, the agency prepares neither an environmental impact statement nor an environmental assessment, courts afford less deference to the agency's decision. *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 640 (9th Cir. 2004).

## <u>FACTS</u>

### A. THE PROPOSED BIG HORN ICE DETENTION FACILITY

This case is about the Big Horn ICE Detention Facility ("Big Horn") located at 3001 Juniper Street in Hudson, Colorado. Big Horn was formerly known as the Hudson Correctional Facility. The facility and property are owned by Highlands REIT, a real estate investment trust based in Chicago.

The facility was built in 2009. Schneider Dec. Ex. 3 at 14th page. From approximately 2009 to 2013, the facility was used to incarcerate Alaska state convicts while Alaska was building a new penitentiary. GEO leased the facility from Highlands REIT and operated the facility during this time. *Id.*

The Hudson Correctional Facility during this period was a prison, not a detention facility or jail. That is, inmates stayed long periods of time rather than being transported in and out of the facility after relatively short stays. In its final year of operations, the average stay length for inmates was 807 days, the median was 717 days, and the maximum was 1,398 days. Schneider Dec. Ex. 8 at 2nd page.

The highest number of inmates was 1,048. Schneider Dec. Ex. 4 at 2nd page. Since April 2013, that is for 13 and a half years, the facility has been dormant, with no environmental impacts from infectious disease, air pollution, water pollution, source water requirements, or traffic. *Id.*

Defendants Secretary Mullin, U.S. Department of Homeland Security, Acting Director Venturella, and U.S. Immigration and Customs Enforcement [hereinafter collectively "Defendants" or "ICE"] made a decision to select Big Horn as an ICE Detention Center as far back as August 2025. Schneider Dec. Ex. 5 at 31st page. ICE has entered into at least two contracts with GEO to operate the Big Horn. Defendants entered into a letter contract on or about December 1, 2025 with GEO to have GEO run the Big Horn Facility as an ICE Detention Facility. Schneider Dec. Ex. 6 at 1st page, Ex. 7 at 104th page. The letter contract had a total contract value of over $39 million dollars for six months of services. Schneider Dec. Ex. 7 at 14th page. A DHS employee noted that "That seems high". *Id.* at 74.

There was no competition or bidding for this letter contract; Defendants issued the $39 million letter contract as a sole source contract. *Id.* at 14th page, 188th- 190th pages. This is despite that fact that another entity, a non-profit organization called

Social Purposes Corrections, had also proposed to operate the exact same Hudson Correctional Facility to ICE in response to an ICE Request For Information ("RFI"). Schneider Dec. Ex. 3 at 36th – 37th.

On July 13, 2026, GEO announced it had entered into a second contract, a five-year support services contract with ICE for the activation of a federal immigration detention facility in Hudson. Schneider Dec. Ex. 9. GEO expects the contract to generate approximately $85 million in annual revenues, excluding transportation revenues. *Id.* The contract is worth up to $528.6 million. Highlands REIT rented the Facility for an ICE Detention Facility to GEO on August 1, 2026. Schneider Dec. Ex. 10 at 3rd page.

The Big Horn Facility can house 1,256 detainees. Schneider Dec. Ex. 3 at 14th page. But Highlands REIT told ICE in response to the request for information that the Big Horn Facility could increase the number of people it detains at Big Horn by adding bunking to its oversized dayrooms. Schneider Dec. Ex. 3 at 13th page. Highlands REIT also owns 37 acres adjacent to the facility and has already received a conditional use permit for a 1,000-bed expansion on that site. *Id.*

At the request for information stage, ICE received information about alternative locations for an ICE detention facility to serve the Denver field office. Schneider Dec. Ex. 3 at 1st – 11th pages. These alternative facilities are in areas without severe air pollution problems, with access to water supplies not from sources critically depleted, like the Colorado River, are served by wastewater treatment plants without a long history of violations and without the current inability to comply with its water pollution

limits, and are not in small towns without adequate roads and access to avoid significant traffic. *Id.* ICE did not evaluate these alternative facilities under NEPA.

## B. THE ENVIRONMENTAL IMPACTS OF BIG HORN

### 1. INFECTION DISEASE AND HEALTH CARE

The facility currently referred to as Big Horn, once operational, will pose an extremely high infectious disease related health risk. Declaration of Dr. Emma Kaplan-Lewis in Support of Plaintiffs' Motion for Preliminary Injunction ("Kaplan-Lewis Dec.") at ¶7. This risk is created by Big Horn's specific congregate correctional setting and amplified by GEO's history of "defying public health laws, blocking outbreak investigation and engaging in an overall contentious and uncooperative relationship with public health authorities" such as the Colorado Department of Public Health and the Environment and Adams County Public Health Department. *Id.* Those at risk include visitors to Big Horn, including attorneys, family members, clergy, general community members in the Metro Denver/North Front Range area, as well detainees and detention center staff. *Id.* at ¶¶8, 9, 15, and 19.

Medical literature establishes that there is a higher risk of infectious disease outbreaks in congregate detention facilities when compared to non-congregate settings. *Id.* at ¶8. The relevant infectious diseases include Tuberculosis ("TB"), Measles, Mumps, Hepatitis A and B, respiratory viruses such as COVID-19, Influenza, Respiratory Syncytial Virus ("RSV"), meningitis, encephalitis, skin and soft tissue infections, multidrug resistant bacteria, and viral gastroenteritis. *Id.* Other infectious

diseases, like Legionnaire's disease, salmonella, and parasites can be spread via water supplies. *Id.* at ¶16.

Reports, both in the media and through the courts, have come out describing inadequate access to medical care within ICE facilities, particularly those operated by GEO. *Id.* Detainees with existing chronic infectious diseases such as HIV, Hepatitis B, and Hepatitis C can have their diseases worsen due to inadequate access to health care and potentially spread to other detainees, staff and visitors. *Id.* Similarly, the risk of infectious disease can increase for people with other chronic medical conditions, such as diabetes mellitus, when they are not getting adequate medical attention including access to a medically appropriate diet. *Id.*

Conditions which promote the spread of infectious disease in congregate detention settings include crowded living conditions, poor ventilation, lack of opportunity wash one's hands, and proper biohazard disposal, such as syringes. *Id.* at ¶9. Defendants have not provided public plans on how they will address these issues, much less given the public, including infectious disease experts, an opportunity to comment on mitigation measures for these issues. Similarly, there are no public plans about water testing to prevent outbreaks of water-based infectious diseases, but this could be addressed through public comments in a NEPA process. *Id.* at ¶16.

However, we do know that certain specific problems exist with Big Horn. For example, it has 7 medical unit cells which would not be enough if there was widespread respiratory illness impacting detainees. *Id.*

Big Horn being an immigrant detention facility heightens even further the infectious disease risk. Detainee populations include individuals more likely to have traveled to, or had contact with someone who has traveled to, TB endemic areas, increasing the chances of a TB outbreak. *Id.* at ¶14. TB is spread by an airborne bacteria and is almost always fatal without treatment. *Id.* at ¶15. An infected individual can easily spread TB in a detention facility. *Id.*

There have also been reports of conditions in GEO operated facilities which are beyond typical congregated settings that increase the risk of infectious disease. *Id.* These conditions include inedible food sources infested with maggots and contaminated drinking water. *Id.*

Air pollutants, such as nitrogen oxides, have been linked to worse clinical outcomes for people with respiratory infections such as COVID-19. *Id.* Big Horn will be a source of nitrogen oxide emissions from the many fossil fuel burning vehicles coming and going from the facility as well as stationary sources of air pollution like diesel burning generators and heating and cooking equipment.

Big Horn has other shortcomings when it comes to addressing infectious disease. These include inadequate medical staffing, travel time to facilities which can provide higher levels of care, and overwhelming the emergency response system of the small Town of Hudson. *Id.* at ¶¶10-11.

Vaccination rates in Metro-Denver are another problem for Big Horn. The school age community vaccination rate is 92.3%, which is lower than what is required for community protection, which is also known as herd immunity. *Id.* at ¶13.

ICE's choice, without a NEPA analysis or competitive bidding, to allow GEO to operate Big Horn poses infectious disease risks well beyond typical congregated settings. *Id.* at ¶12. GEO has a history of defying public health law, obstructing infectious disease investigations, and inappropriately handling infectious disease outbreaks. *Id.* GEO has also demonstrated a lack of training of staff in infection prevention and control procedures and failed to implement basic sanitary conditions. *Id.*

The GEO operated detention facility in Aurora refused to comply with public health orders from the Adams County public health department and the Colorado Department of Public Health and the Environment regarding the spread of TB after it was determined that there was a detainee with TB in the facility in June, 2026. *Id.* at ¶15. One report stated that a total of 12 people ended up testing positive for TB during this incident.[1] TB "is the world's leading cause of death from a single infectious agent and among the top 10 causes of death" according to the World Health Organization.[2]

Governor Polis got personally involved in the situation with GEO, but to no avail. Thus, the Colorado Department of Public Health and the Environment had to file a motion for preliminary injunction to force GEO to comply with the public health order. *See Colorado Department of Public Health and the Environment v. GEO Group*, 26-cv-31629 (Adams County District Court Aug. 20, 2026) Motion for Preliminary Injunctive Relief.

[1] Richard Luscombe, Tuberculosis outbreak at Colorado ICE jail sickens at least 12 detainees, The Guardian, July 14, 2026 available at https://perma.cc/2Y36-L53Z.
[2] https://www.who.int/news-room/fact-sheets/detail/tuberculosis last visited Oct. 13, 2026.

Later, it was revealed that in September of this year, GEO placed a housing unit in its Aurora Detention Facility on a quarantine between September 11 and 14 after detainees were told they were exposed to TB. Schneider Dec. Ex. 14 at 2nd page. But GEO and ICE refused to comment on this or provide Senator Hickenlooper's office any information and local health officials said they had not received any information about a new case of TB at the Aurora Detention Facility. *Id.*

Litigation to avoid public health inspections and investigations rather than cooperation seems to be GEO's norm. The Washington Department of Health had to get two preliminary injunctions to inspect a GEO run ICE detention facility in Tacoma, Washington. Schneider Dec. Ex. 11 at 27 – 28, Ex. 13 at 13-14. GEO lost its case against California regarding California's health inspections of GEO detention facilities. Schneider Dec. Ex. 12 at 1–2. GEO also sued to stop some of Colorado's public health requirements applicable to ICE detention facilities. *See GEO Group v. Hunsaker Ryan*, 26-cv-2533-DDD-SBP, Dkt. # 34 (D. Colo. Aug. 20, 2026) (Order Granting in Part and Denying in Part Motion for Preliminary Injunction).

Containment of infectious disease relies heavily on contact tracing by public health officials and collaborative relationships in general with public health authorities. Kaplan-Lewis Dec. at ¶¶ 15, 17. This is especially import for TB because once exposed, an individual can develop an active or latent case of TB. *Id.*

2. AIR POLLUTION

A. OZONE

The Town of Hudson, where Big Horn is located, is in the Denver Metro/North Front Range area that for over 15 years has been in violation of the U.S. Environmental Protection Agency ("EPA") national ambient air quality standards for ground level ozone, commonly referred to as smog. Declaration of Jana Milford in Support of Plaintiffs' Motion for Preliminary Injunction (Milford Dec.) at ¶11. There are numerous other dispersed air pollution sources in this area, including oil and gas extraction and processing equipment, industrial animal agricultural facilities, and mobile sources of air pollution such as cars, trucks, and buses. *Id.*

Ozone is not directly emitted out of tailpipes and smokestacks. Rather, it is formed in the ambient air by a reaction between precursor pollutants – volatile organic compounds and nitrogen oxides - in the presence of sunlight. *Id.* at ¶13. Ozone is a regional pollutant meaning that it and its precursors can be transported through a large region like Metro Denver and the North Front Range. *Id.* at ¶14. Emissions from many sources spread out through the nine counties, including Weld County, which make up the Metro Denver/North Front Range region contribute to the area's severe ozone problem. *Id.* In other words, ozone presents a "death by a thousand cuts" type of situation.

In 2026, four of the State's ozone monitors near the Town of Hudson, in Welby, Loveland, Greeley, and La Salle, measured ozone above the level of the EPA national ambient air quality standard, that is 0.070 parts per million. *See e.g.* Schneider Dec.

Ex. 15, 16. But regardless of the national ambient air quality standard, "more ozone is more ozone, and there is no 'threshold concentration below which' ground-level ozone is 'known to be harmless.' *Am. Trucking Ass'ns, Inc. v. EPA*, 283 F.3d 355, 360 (D.C. Cir. 2002)[.]" *Clean Wisconsin v. EPA*, 964 F.3d 1145, 1158 (D.C. Cir. 2020). In other words, individuals can and do suffer adverse effects from air pollutants, including ozone but also including nitrogen oxides and particulate matter, when the pollutants are at levels below the national ambient air quality standards. This is because the national ambient air quality standards are policy judgments about acceptable risk of harm; not levels at which individuals experience no harm. *Mississippi v. EPA*, 744 F.3d 1334, 1342-3 (D.C. 2013).

Those most susceptible to harm from ozone pollution are children, the elderly, individuals with chronic lung disease like asthma and COPD, and those who work or exercise outside. 80 Fed. Reg. 65,292, 65,322 (Oct. 26, 2015).

Short-term (hours to days) exposure to ozone causes asthma attacks and aggravation of chronic bronchitis, difficulty breathing, and airway inflammation. Milford Dec. at ¶17. It also likely causes metabolic effects and there is suggestive evidence of cardiovascular and nervous system adverse effects and premature mortality. *Id.*

Long-term (months to years) exposure to ozone likely causes children to develop asthma and there is suggestive evidence of reproductive and developmental, cardiovascular, metabolic, and nervous system adverse effects and mortality. *Id.*

Children, the elderly, people with existing respiratory illness such as asthma, and people who work or exercise outside are especially at risk of adverse health outcomes from exposure to ozone.

Ozone can also reduce crop yields and alter the composition of some ecosystem communities. *Id.* at ¶18. This includes damage to the iconic quaking aspen trees in Rocky Mountain National Park, which is partly located in the same Denver Metro North Front Range ozone nonattainment area that includes Hudson. *Id.*

The impacts from air pollution, including ozone, have tremendous economic impact. EPA set the 2015 ozone national ambient air quality standard at 70 parts per billion ("ppb"). The 2015 ozone national ambient air quality standard has an upper bound annual net economic benefit beginning in 2025 of up to $5.3 billion in 2011 dollars.[3] The non-net upper bound total health benefit is $8 billion.[4] But if EPA had set the standard at the more protective level of 65 parts per billion, there would have been such a dramatic decrease in illness and death such that the upper bound total health benefit would have been $34.2 billion.[5] EPA's Clean Air Scientific Advisory Committee recommended, based on its review of the scientific literature, that the 2015 standard be set in the range of 60 to 70 ppb with a preference of the standard in the low end of the

---

[3] EPA, Reviewing National Ambient Air Quality Standards – Scientific and Technical Information (Mar. 4, 2016), Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone, at ES-15, ES-18.

[4] EPA, Reviewing National Ambient Air Quality Standards – Scientific and Technical Information (Mar. 4, 2016), Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone, at ES-15, ES-18.

[5] EPA, Reviewing National Ambient Air Quality Standards – Scientific and Technical Information (Mar. 4, 2016), Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone, at ES-15, ES-18.

range.[6] But the Clean Air Scientific Advisory Committee noted that the level of the national ambient air quality standard is a policy judgment left up to the EPA administrator.

The State's pollution monitoring data already establishes that this area will fail to meet the 2008 ozone national ambient air quality standard by its July 20, 2027 deadline. *Id.* at ¶20. This failure triggers a Clean Air Act requirement to assess fees on all major sources of ozone precursor pollutants in the Denver Metro North Front Range area of over $12,000 for each ton of emissions they emit over 80% of their baseline or permitted level, until such time as ozone levels are brought below the standard and the area meets other requirements. *Id.*

Big Horn will directly emit as well as induce emission of ozone precursors. Although there is no publicly available analysis under NEPA precisely detailing the sources and exact amount of emissions from Big Horn, it is expected that Big Horn as an active detention center will have a backup generator, furnaces, and boilers which emit the ozone precursor pollutants volatile organic compounds and nitrogen oxides. *Id.* at ¶22. For example, when the site was the Hudson Correction Facility, it had an air pollution permit for a large diesel burning backup generator. *Id.*

Big Horn will also induce emissions of ozone precursor pollutants volatile organic compounds and nitrogen oxides as an "indirect source" due to emissions from cars, trucks, and vans transporting employees, visitors, detainees, and supplies as well as

---

[6] Amanda Reilly, *EPA Defends New Ozone Standard as Green Allies Fume,* Environment & Energy Publishing, Oct. 2, 2015, *available at* http://www.eenews.net/stories/1060025767.

airplanes transporting detainees. *Id.* at ¶23. Big Horn's proximity to an airport is a key component of its function as an ICE detention facility. *See e.g.* Schnieder Dec. Ex. 3 at 12th page.

The Clean Air Act allows states to regulate indirect sources, but Colorado has elected not to do so. Milford Dec. at ¶24. Thus, NEPA would be the mechanism to obtain information about Big Horn's emissions as an indirect source. *Id.* at ¶25.

Thus, from both direct and indirect sources, Big Horn "would produce emissions that can contribute to ozone formation, tending to increase ozone levels and corresponding health and welfare risks and making it harder for the state to meet the ozone NAAQS." *Id.* at ¶¶22-23.

B. NITROGEN OXIDES ("NOx")

Nitrogen oxides not only contribute to ozone formation but also is are a dangerous air pollutant in its own right and thus has its own national ambient air quality standard. *Id.* at ¶26. Unlike ozone, which is a regional pollutant, nitrogen oxides ("NOx") tend to have their greatest impacts close to their emission source such as a diesel burning generator or a heavily trafficked roadway. *Id.* This means that monitors are not particularly effective at determining NOx levels at a specific location; computer modeling, which has not been done for Big Horn, is the much better tool. *Id.* at ¶30.

Just a few minutes of exposure to NOx emissions can trigger asthma attacks. *Id.* at ¶27. The evidence is also suggestive that short term exposure to NOx can trigger heart attacks and premature mortality. *Id.* Long-term exposure is likely to cause

children to develop asthma and suggestive of causing cardiovascular and nervous system effects, diabetes, adverse birth outcomes, cancer, and mortality. *Id.*

Hudson and the surrounding area are the source region for NOx emissions that affect plants and animals, and reduce biodiversity, in Rocky Mountain National Park via excessive atmospheric deposition, which people commonly refer to as acid rain. *Id.* at ¶38. Efforts to reduce excessive atmospheric deposition in Rocky Mountain National Park have not enjoyed much success. *Id.* at ¶¶38-43. Big Horn will add pollution to this situation. As noted above, Big Horn will directly produce NOx emissions through its diesel burning generator, heaters, and boilers, and induce NOx emissions from cars, trucks, vans, and airplanes. *Id.* at ¶¶22-23.

C. PARTICULATE MATTER

Big Horn will also produce and induce particulate matter ("PM") air pollution from its generators, boilers, and furnaces and from tailpipe emissions. *Id.* at ¶31. Furthermore, the unpaved roads near Big Horn will also be a large source of localized particulate matter air pollution as well as farther afield. *Id.* at ¶¶31-33.

Both short-term and long-term exposure to particulate matter causes premature mortality and cardiovascular illness. *Id.* at ¶34. *See also Catawba County v. EPA*, 571 F.3d 20, 26 (D.C. Cir. 2009) ("A 'significant association' links elevated levels of PM[2.5] with adverse human health consequences such as premature death, lung and cardiovascular disease, and asthma.") "Epidemiology studies do not indicate a safe

exposure level for mortality risks from PM2.5 exposure." Milford Dec. at ¶34. Furthermore, particulate matter is likely to cause respiratory illness, nervous system effects and cancer. *Id.*

D. POTENTIAL AIR POLLUTION MITIGATION MEASURES

If ICE were to conduct an analysis under NEPA for the Big Horn facility, there are numerous measures to mitigate air pollution which could be considered. These include reducing particulate matter emissions from roads by applying water or other substances to unpaved roads, planting shelter belt and erosion control vegetation, and paving unpaved roads, driveways, and parking lots. *Id.* at ¶44. Volatile organic compounds could be reduced by use of electric or low-emission vehicles. *Id.* NOx could be reduced by also using electric or low-emission vehicles, backup generators, boilers, and furnaces. *Id.* All of the air pollutants discussed above could be reduced by providing onsite vehicle charging stations, limiting vehicle idling, and car or van pooling services.

3. WATER POLLUTION

Big Horn will discharge its wastewater and sewage into the Town of Hudson's Publicly Owned Treatment Plant ("POTW"), which is commonly referred to as a sewage plant. Hudson's publicly owned treat plant, in turn discharges its effluent into the Box Elder Creek, which has been designated by the Colorado Division of Parks and Wildlife as an Aquatic Native Species Conservation Water. This means it requires conservation measures to protect native aquatic species.

When GEO previously operated the facility under the name of the Hudson Correctional Facility, the facility discharged oil and grease that inhibited or disrupted

Hudson's treatment works. Schneider Dec. Ex. 23. Those discharges contributed to violations of Hudson's discharge permit, forced Hudson to incur approximately $65,000 in extraordinary response costs, and resulted in a federal Clean Water Act consent agreement and penalty against GEO. *Id.* Those facts concern the same facility, the same operator, and the same municipal treatment plant.

Since Big Horn closed in 2013, Hudson's water pollution permit requirements have become more stringent. Schneider Dec. Ex. 22; Ex. 23 at 90. Hudson also reports that peak hydraulic flows and organic loading consistently exceed the plant's current capacity, that maintenance has been deferred, and that the treatment works are deteriorating*.* *See generally* Schneider Dec. Ex. 23. The treatment plant has repeatedly violated its water pollution permit, with over 103 violations, including operational and monitoring violations documented during an August 2024 inspection. Schneider Dec. Ex. 26, Ex. 27 at 4-6. The 11 "E. coli" violations most probably come from improperly treated fecal matter. Its newer discharge permit imposes additional effluent limitations, while construction needed to address total inorganic nitrogen limits is not scheduled for completion until 2029. Schneider Dec. Ex. 27; Ex. 28.

But State regulators have already "pre-authorized" their exercise of enforcement discretion concerning certain compliance obligations such that they have told the Town of Hudson that the State regulators will not enforce violations of the Town of Hudson's water pollution permit. Schneider Dec. Ex. 29; Ex. 30.

ICE chose Big Horn, selected its proposed capacity, and determined the conditions under which the facility would operate. ICE also could have selected a

different location, reduced the scale of operations, phased occupancy, or required adequate pretreatment and wastewater capacity before opening. Schneider Dec. Ex. 3 at 1-11. Indeed, ICE received proposals for alternative locations whose municipal wastewater systems lacked comparable histories of violations and capacity constraints. *Id.* ICE did not analyze those alternatives.

4. WATER SUPPLY

ICE cannot confine and serve over 1,110 people at Big Horn without a large, continuous, and reliable water supply. Yet ICE selected the facility without analyzing whether the Town of Hudson has that supply. The arithmetic is not complicated. Hudson owns 662 units in the Colorado-Big Thompson system. Schneider Dec. Ex. 20 at 16. Those units, however, do not guarantee delivery of 662 acre-feet each year because deliveries depend on the annually declared quota. *Id.*; *see also* Schneider Dec. Ex. 24 at 31. At the 50-percent quota in effect in November 2025, Hudson's 662 units produced only 331 acre-feet. Schneider Dec. Ex. 25 at 31. The quota increased to 80 percent in April 2026, yielding 529.6 acre-feet. Schneider Dec. Ex. 21. Hudson also possesses groundwater rights, but its existing reverse-osmosis infrastructure can presently process only 55 acre-feet per year. Schneider Dec. Ex. 20 at 22. Thus, at the 80-percent quota, Hudson's practical supply is 584.6 acre-feet. *Id.*

Hudson's historic high-year use of 340 acre-feet, combined with Big Horn's projected 230-acre-foot demand, totals approximately 570 acre-feet. Schneider Dec. Ex. 20 at 12. Total projected demand is approximately 697 acre-feet, including Big Horn and other planned developments. *See* Schneider Dec. Ex. 20 at 22. That demand

exceeds Hudson's practical supply at an 80-percent quota by approximately 113 acre-feet. *See* Schneider Dec. Ex. 20. It even exceeds the nominal 662-acre-foot yield Hudson could receive if each unit delivered a full acre-foot, which is an assumption the quota system does not guarantee. *See generally* Schneider Dec. Ex. 20.

Big Horn (formerly the Hudson Correctional Facility) is projected to require approximately 230 acre-feet of water annually. Schneider Dec. Ex. 20 at 12, 19, 20. That single facility would add demand equal to roughly two-thirds of Hudson's entire historic high-year use of 340 acre-feet, which occurred while Big Horn was vacant. *Id.* Big Horn is therefore not a minor addition to the municipal system. It would become one of the system's dominant users. The Town of Hudson itself has acknowledged immediate water-source and infrastructure constraints affecting future growth. *See* Schneider Dec. Ex. 20. Additional supply associated with the Chimney Hollow project is not presently available and may remain unavailable for another five or six years. Schneider Dec. Ex. 24.

5. TRAFFIC

Traffic is integral to how Big Horn will operate. Detainees must be transported between Big Horn and other facilities. Hundreds of employees must travel to and from work. Trucks must deliver food, materials, and other supplies. Family members, attorneys, clergy, contractors, and other visitors must reach the facility. Declaration of Virginia McAfee in Support of Plaintiffs' Motion for Preliminary Injunction ("McAfee Decl.") ¶¶3–4 & McAfee Ex. 1 at 5.

McAfee's opinions rest on 45 years of experience conducting environmental review under state and federal law, including work applying NEPA for federal transportation agencies and teaching NEPA to transportation professionals. McAfee Decl. ¶¶ 1–2. She conducted multiple site visits during 2025 and 2026, measured road conditions, photographed the surrounding network, observed traffic patterns, reviewed CDOT's SH 52 Planning and Environmental Linkages Study and transportation data, and consulted transportation professionals and CDOT personnel. *Id.* ¶¶ 3–4. Her observations reveal a traffic network poorly suited to absorb the substantial new demand ICE proposes to impose on it.

Big Horn is expected to house approximately 1,200 detainees and employ hundreds of staff. McAfee Ex. 1 at 5. The resulting traffic will come from at least four distinct sources: detainee transportation; employee and contractor commuting; commercial deliveries; and visits by family members, attorneys, clergy, and others. *Id.* The facility has no fixed-route public transit and no public bus service. McAfee Ex. 1 at 6. Employees, contractors, visitors, and service providers will have to rely primarily on private cars and trucks.

McAfee estimates that a facility of this size will generate approximately 1,000 to 1,200 vehicle trips per day, with approximately half entering and half exiting. McAfee Ex. 1 at 5. That estimate may be conservative considering the specific nature of an ICE detention facility. In a town with a 2020 population of approximately 1,651, the addition of 1,000 to 1,200 vehicle trips every day would be substantial and conspicuous. *Id.*

ICE's detention-reengineering materials contemplate that regional processing centers will hold detainees for only three to seven days, which would require a greater frequency of detainee arrivals, departures, transfers, and associated support trips than a conventional detention facility with a relatively stable population. *Id.* ICE has not disclosed whether it intends to operate Big Horn as such a regional processing center or as a longer-term detention facility. Either way, ICE has supplied no analysis of how the facility's actual detention model will affect traffic volumes. Even if ICE had looked to Big Horn's former operations, that data would not satisfy the hard look NEPA requires. During its last year of operation in 2013, Big Horn operated for only four months and housed between roughly 796 and 1,029 people, which is fewer people than Big Horn's proposed population. *Id.* at 5-6. Big Horn also was not previously operated under the high-turnover processing model ICE's own materials contemplate. *Id.* at 1, 6.

Traffic approaching from the Denver metropolitan area will likely use the I-76 off-ramp serving SH 52. McAfee Ex. 1 at 7. That off-ramp consists of a single lane that splits into left- and right-turn movements at the signalized intersection with SH 52. McAfee Ex. 1 at 7. McAfee observed that, during one signal phase, only two semi-trucks and one passenger vehicle cleared the left turn. McAfee Ex. 1 at 7. Heavy trucks already use the interchange in substantial numbers, accelerate slowly on the uphill ramp, and consume additional signal time. McAfee Ex. 1 at 7-8. McAfee concluded that the additional traffic generated by Big Horn could cause queues extending back toward or onto I-76 itself. McAfee Ex. 1 at 8.

The constraints continue after vehicles leave SH 52. The Frontage Road, Oak Street, and 30th Avenue are approximately 24 feet wide between their striped edges. *Id.* at 9. They provide only two travel lanes, with no shoulders and no separate space for turning vehicles. *Id.* The turns from the Frontage Road to Oak Street and from Oak Street to 30th Avenue are essentially right angles posted at 15 miles per hour. *Id.* The pavement is cracked and deteriorating, road shoulders are absent, and centerline markings are fading. *Id.* at 8. Juniper Street turns from pavement to dirt and gravel north of Big Horn's second entrance, further limiting alternative access to the facility. *Id.* at 10.

The Frontage Road also contains multiple closely spaced access points. Multiple businesses obtain access from the east side of the road, with vehicles entering the Frontage Road from access drives controlled only by stop signs. *Id.* Retail businesses depend heavily on left turns toward SH 52. *Id.* at 10-12. The additional traffic generated by Big Horn will reduce available gaps for those turns, impair ingress and egress, and further complicate the movement of heavy trucks already using the corridor. *Id.*

McAfee also identifies an already problematic five-legged intersection involving the Frontage Road, the Tractor Supply access, County Road 43½, the route toward County Road 12½, and the access point serving Love's. *Id.* at 10. She describes that intersection as unsafe under existing conditions. *Id.* Big Horn will add hundreds of daily entering and exiting movements to this network without turn lanes, shoulders, or any identified intersection improvement. *Id.*

Nor will Big Horn enter a static traffic environment. A new QuikTrip gas station and convenience store was already under construction near the SH 52 and Frontage Road roundabout during McAfee's site review. *Id.* at 11, 13. CDOT's SH 52 Planning and Environmental Linkages Study separately recognizes growing development, changing traffic patterns, and the need for short- and long-term improvements along the corridor. *Id.* at 13. The proposed Bandimere development near Hudson encompasses more than 1,100 acres and contemplates an approximately 80-acre parking area, commercial and retail development, motorhome accommodations, and multiple access routes. *Id.*

Big Horn's induced traffic will likely increase collision risks for motorists, pedestrians, and bicyclists; impair access to nearby businesses and residential areas; accelerate deterioration of already damaged pavement; increase vehicle noise and tailpipe emissions; interfere with emergency access; and increase vehicle-related wildlife mortality. *Id.* at 12-14. Residences along Oak Street will experience additional wheel and braking noise as vehicles negotiate the narrow right-angle turns. *Id.* at 9. Pedestrians using the recently constructed sidewalk along SH 52 will encounter increased vehicle movements through an already truck-heavy corridor. *Id.*

## **ARGUMENT**

### A. PLAINTIFFS HAVE STANDING

A plaintiff establishes Article III standing by showing (1) injury-in-fact that is actual, concrete and particularized, (2) a causal connection tracing the injury to the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable

decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-1 (1992). An organization may establish representational standing on behalf of its members by showing that (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires individual participation in the lawsuit. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). An organization has injury-in-fact in its own right when the challenged conduct concretely and demonstrably injures the organization's activities by draining its resources. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

GreenLatinos' individual members, including Annamarie Martinez and Amy Ostwald, reside and recreate in the Denver Metro/North Front Range ozone nonattainment area and suffer from asthma putting them in the group of people especially at risk from ozone pollution. Declaration of Annamarie Martinez in Support of Plaintiff's Motion for Preliminary Injunction ("Martinez Dec.") at ¶¶ 8, 14; Declaration of Amy Ostwald in Support of Plaintiff's Motion for Preliminary Injunction ("Ostwald Dec.") at ¶¶ 10, 17. As explained above, Big Horn will emit and induce emission of ozone precursor air pollutants. *See Supra* p. 18. Because both the Big Horn facility and these members are located in the same nonattainment area, air pollution emissions from the facility threaten their health, establishing an injury-in-fact that is fairly traceable to Defendants. *See Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1246 (10th Cir. 2021). Protecting clean air is central to GreenLatinos' organizational purpose. Declaration of Ean Tafoya in Support of Plaintiff's Motion for

Preliminary Injunction at ¶¶ 4, 6. This action does not require individual member participation.

One of CIRC's member organizations, PODER, provides free legal services to immigrants in removal proceedings by sending volunteer attorneys into detention facilities. Declaration of Kimberly Baker Medina in Support of Plaintiff's Motion for Preliminary Injunction ("Baker Medina Dec.") at ¶4. Exposure to heightened risk of infectious diseases at the Big Horn facility directly threatens the physical safety of these attorneys, undermines PODER's core mission, and creates uninsured liability exposure for the organization. *Id* at ¶¶ 9, 10, 11. The physical and operational harm to PODER and their attorneys confers standing on PODER. PODER's interests are germane to CIRC's mission of improving the lives of immigrants in Colorado, and PODER's individual participation is not required.

B. PLAINTIFFS ARE VERY LIKELY TO PREVAIL ON THE MERITS

Plaintiffs are very likely to prevail on their APA claim that ICE violated NEPA by not preparing an EIS, an EA, or documenting a categoric exclusion for Big Horn. In order to prevail on this claim, Plaintiffs must establish there was a "major federal action" that was also a "final agency action". 42 U.S.C. §§ 4332(2)(C), 4336(a)(1). Because ICE did not even prepare an EA, Plaintiffs do not have to establish that Big Horn has significant environmental effect. 42 U.S.C. § 4336(b)(2); *Envtl. Def. Ctr.*, 36 F.4th at 879–80; *Winter*, 555 U.S. at 23. However, Big Horn certainly will have significant environmental effects.

Major federal action means an action that "is subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A). Big Horn is subject to substantial federal control and responsibility. ICE is responsible for the detention of "aliens" in removal proceedings, precisely the people who are going to be in Big Horn. Schneider Dec. Ex. 7 at 97th page. Big Horn is a US ICE Enforcement and Removal Operations (ERO) Contract Detention Facility. *Id.* at 9th page. The immigrants at Big Horn will be in "ICE Custody". *Id.* Big Horn will be operated in accordance with ICE's National Detention Standards. *Id.* If ICE is setting the standards, they are in control.

As to final agency action, the two-part finality test articulated in *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) requires that, to be final, an action must be the consummation of the agency's decisionmaking process and that rights or obligations have been determined or legal consequences flow from the action. Here, ICE's decision to use Big Horn as an ICE detention facility and to contract with GEO to run the detention facility are the consummation of ICE's process. There are no more steps for ICE to take. Renovations have already started on Big Horn, and legal consequences flow from the action including GEO being paid a lot of money and detainees being detained once the renovations and construction are complete. As the 10th Circuit has held, failure to comply with NEPA constitutes "final agency action" under the APA. *Catron Cnty. Bd. of Comm'rs*, 75 F.3d at 1434.

ICE has acknowledged the need to comply with NEPA and review the environmental impacts of detention facility construction and operation for facilities other than Big Horn. For example, in 2021, ICE completed an EA for the El Paso Service

Processing Center. Schneider Dec. Ex. 17. The EA included a description of the proposed action and three alternatives, including an analysis of the impact that each option would likely have on a broad array of resource areas including: water quality, biological resources, utilities and infrastructure, air quality, transportation and traffic. *Id.*

ICE's prior NEPA reviews extend to contractor-owned/contractor operated detention facilities like Big Horn. In 2016, prior to awarding a contract for the construction, renovation, and operation of a 1,000-bed private detention facility near Houston, Texas, ICE prepared and made public an EA. Schneider Dec. Ex. 18 at 6.

As recently as August 28, 2026, ICE issued a Request for Proposals ("RFP") soliciting contracts for comprehensive detention facility services, transportation services, food services, operations and maintenance services, and related support services for ICE detainees in Enforcement and Removal Operations custody. Schneider Dec. Ex. 19 at 2nd to 3rd page. This included the Denver area. *Id.* The request for proposal requires the offerors to include in their phase 1 submission environmental and site information "to support the Government's NEPA review." *Id.* at 7th page.

The DHS Instruction Manual emphasizes that "NEPA applies to the majority of DHS actions. . .Examples of situations in which NEPA is not triggered are very few." Schneider Dec. Ex. 1 at V-1. Courts have also found that NEPA is required before a federal agency creates and operates a new prison or detention facility. *See e.g.* *Citizens Advisory Comm. on Priv. Prisons, Inc. v. USDOJ*, 197 F. Supp. 2d 226, 242 (W.D. Pa. 2001), aff'd, 33 F. App'x 36 (3d Cir. 2002) (concluding that an agency violated

NEPA when it awarded a contract to a private entity and allowed construction on the project to proceed without first conducting environmental review).

Plaintiffs are not aware of any evidence that ICE documented the application of a categoric exclusion for Big Horn. Even if ICE had, the construction, renovation and operation of Big Horn cannot plausibly be characterized as an action that "normally does not significantly affect the quality of the human environment." *See* 42 U.S.C. § 4336e((1) (defining the types of actions that are subject to a "categorical exclusion" and do not require environmental review). Despite Defendants' failure to conduct any meaningful review or disclosure of Big Horn's potential environmental impacts, the available evidence shows that they will be significant, including deadly outcomes from infectious disease and air pollution. *See Infra* at 10 - 28.

Specifically, as to the air pollution that Big Horn will emit or induce, DHS's own guidance indicates that proposed actions with potential for significant degradation of already poor environmental conditions require heightened scrutiny, indicating particular concern where a community or location already faces a heightened pollution burden. Schneider Dec. Ex. 1 at 35th-36th.

The Metro Denver North Front Range area where Big Horn is located has a severe ozone problem, indicating it already faces a heightened pollution burden when it comes to ozone. *See Infra* at 15, 18. Big Horn will add to this already heightened pollution burden. *See Infra* at 18.

DHS's guidance also calls out potentially significant effects on public health. Schneider Dec. Ex. 1 at 35th-36th. Big Horn has a high risk of spreading potentially

deadly infectious diseases like TB and COVID-19 to detainees, visitors, employees, and the general public. *See Infra* at 10 - 14. This is a significant effect on public health.

As to water pollution, ICE failed to analyze the direct and reasonably foreseeable effects of Big Horn's wastewater on Hudson's treatment system. This case does not involve a remote chain of environmental consequences or an independent future project beyond ICE's authority. Big Horn's wastewater will be generated by the facility ICE selected and discharged into the Town of Hudson's publicly owned treatment plant. Schneider Dec. Ex. 22; Ex. 23 at 90. ICE controls whether Big Horn opens, how many people it confines there, and the contractual and operational conditions under which the facility operates. Schneider Dec. Ex. 3; Ex. 6; Ex. 7; Ex. 9. Big Horn's wastewater generation is therefore a direct and reasonably foreseeable consequence of the federal action.

The wastewater risk is not hypothetical. The same facility has already disrupted the same treatment plant. Since then, Hudson's permit requirements have become more stringent, the plant has experienced capacity and maintenance problems, and regulators have documented additional compliance violations. Schneider Dec. Ex. 23; Ex. 26-30. ICE was required to consider that history and those present conditions before committing the federal government to reopen the facility. It did not do so.

The presently available information identifies no completed pretreatment upgrade or plan adequate to serve the proposed use. Despite that history, ICE committed to reopen Big Horn without evaluating whether Hudson's strained municipal system could safely accept the facility's wastewater or whether a different location, reduced capacity,

phased occupancy, or enforceable pretreatment requirements could avoid or mitigate the resulting effects.

In *N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 713-716 (10th Cir. 2009), as part of NEPA review, the agency characterized groundwater contamination risks as minimal without record evidence establishing how much wastewater the project would produce or whether the proposed disposal method could accommodate it. The court found that it was "wholly unable to say with any confidence that [the agency] 'examined the relevant data'" regarding the implicated aquifer prior to asserting that any impacts upon it would be "minimal." *Id.* at 715. The court held that the agency acted arbitrarily in its NEPA analysis by failing to provide evidentiary support of its assertion that any impacts upon the aquifer would be minimal. *Id.* Here, ICE failed to provide any analysis at all.

As to the water supply for Big Horn, projected water demand is an inevitable consequence of operating the facility at the site ICE selected. It is a direct and unavoidable operational demand of Big Horn itself.

The existing record demonstrates why that question required analysis. At an 80-percent Colorado-Big Thompson quota, Hudson's identified practical supply is approximately 584.6 acre-feet, while its projected demand, including Big Horn and other planned development, is approximately 697.6 acre-feet. Schneider Dec. Ex. 20; Ex. 21. Big Horn alone is projected to require approximately 230 acre-feet annually. Schneider Dec. Ex. 20 at 12, 19-20. Thus, even under an 80-percent quota, the identified demand exceeds the identified supply by approximately 113 acre-feet.

ICE did not reconcile those numbers. It did not identify an additional source of water. It did not analyze the reliability of Hudson's existing sources. It did not explain what would happen during a lower-quota year. It did not evaluate whether supplying Big Horn would displace existing or planned municipal uses. It did not evaluate alternatives or mitigation.

Two additional Tenth Circuit cases provide guidance on the need for an agency to consider water supply as part of its NEPA analysis. In *Diné Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 859 (10th Cir. 2019) ("Diné I"), the court found that where the agency failed to consider cumulative water usage associated with reasonably foreseeable future oil and gas well activity in the project area, the agency issued an arbitrary and capricious finding of no significant impact under NEPA. On remand, however, in *Diné Citizens Against Ruining Our Env't v Haaland*, 59 F.4th 1016, 1044-1045 (10th Cir. 2023), the court found that the agency completed a satisfactory water supply cumulative impact analysis under NEPA because "it considered how much water was likely to be used, including if all the wells employed the most water-intensive methods" and then compared that usage with total projected usage in the region, while noting other mitigating factors to offset water usage. In other words, the agency went back to take a hard look and compile a record that sufficiently explained a rational basis for its decision under NEPA. Here, ICE failed to do either.

Big Horn's traffic is another direct and foreseeable consequence of ICE's decision to operate a large detention facility at this location. Plaintiffs need not establish at this stage that a particular interchange improvement or access permit will ultimately

be required. The relevant point is that ICE never performed the necessary analysis of the impact of traffic. The record does not show that ICE determined how Big Horn's traffic would be distributed, whether the I-76 ramp could accommodate it, whether improvements would be necessary, whether those improvements would affect adjacent properties and resources, or what mitigation could reduce those effects.

At minimum, the evidence establishes that the significance of Big Horn's traffic effects was unknown. The project therefore required at least an EA. *See* 42 U.S.C. § 4336(b)(2). Because ICE prepared no EA, no EIS, and no categorical-exclusion determination, Plaintiffs are likely to establish that its decision was arbitrary, contrary to law, and made "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

The controlling circuit decisions expose the seriousness of that omission. In *Davis v. Mineta*, 302 F.3d 1104, 1122–26 (10th Cir. 2002), the Tenth Circuit held that an EA and finding of no significant impact were inadequate where the agency failed to address transportation-related effects, conflicting agency concerns, reasonable alternatives, and the project's broader environmental consequences. The agency in *Davis* at least prepared an EA and employed a traffic model. *Id.* at 1122–23. Here, ICE did neither.

C. PLAINTIFFS WILL SUFFER IRREPARABLE INJURY

If a preliminary injunction is not issued, Plaintiffs face irreparable injuries from infectious disease, air pollution, and traffic. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least

of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Absent a preliminary injunction directing Defendants to preserve the status quo at Big Horn until they perform the required assessment of the full range of environmental impacts, Plaintiffs' interests in their health and very lives, as well their service to immigrants in need of legal assistance and other services will suffer irreparable harm. Plaintiffs do not have to precisely quantify the harm which will happen in the future. "Plaintiffs [meet] their burden to establish a likelihood of irreparable harm by showing that [the federal action] will have some environmental impacts, even if the extent of those impacts are not fully known." *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 25 (D.D.C. 2009).

And beyond this physical harm, Plaintiffs are suffering the procedural harm caused by Defendants' decision to begin construction, renovations, and operations of Big Horn without conducting environmental analysis and without Plaintiffs' viewpoints or notice—contrary to the purpose of NEPA. *See Ctr. for Biological Diversity*, 141 F.4th at 993 (NEPA's procedural requirements mandate "hard look" at environmental consequences); *W. Watersheds Project v. Bernhardt*, 391 F. Supp. 3d 1002, 1022–23 (D. Or. 2019) (courts generally find irreparable harm where procedural violation is combined with showing of environmental injury).

1. PLAINTIFFS FACE IRREPARABLE HARM FROM INFECTIOUS DISEASES

Plaintiffs face irreparable harm from the extremely high infectious disease related health risk. This includes infectious diseases such as TB, measles, COVID-19 and

multidrug resistant bacteria. The currently existing ICE Detention Facility in Aurora has had recent incidents with TB infected detainees. *See Supra* at 13-14.

As explained above, it is well documented in the literature that congregated correctional settings pose a high risk of infectious disease outbreaks. *See Supra* at 10-11. But Big Horn heaps on additional levels of risk. First, because it is immigrant detention facility, detainee populations include individuals more likely to have traveled to, or at least had contact with someone who has traveled to, TB endemic areas or other places with significant infectious disease risks. *See Supra* at 12. Then, ICE detention facilities, particularly those operated by GEO, have inadequate access to medical care. *See Supra* at 11. Similarly, Big Horn does not have enough medical unit cells to deal with widespread respiratory illness impacting detainees. *Id.* There have also been reports of conditions like inedible food sources infested with maggots and contaminated drinking water as GEO operated facilities. *See Supra* at 12. Big Horn's other shortcomings include travel times to medical facilities which provide higher levels of care and overwhelming the emergency response system of the small Town of Hudson. *Id.* Metro-Denver also has a community vaccination rate below what is needed for herd immunity. *Id.* GEO has also demonstrated a lack of training of staff in infection prevention and control procedures and failed to implement basic sanitary conditions. *Id.*

Perhaps the most egregious exacerbating factor is GEO has a significant history of defying public health laws, obstructing infectious disease investigations, and inappropriately handling infectious disease outbreaks. *See Supra* at 13-14.

Collaboration and cooperation with public health officials is a critical component of successfully containing infectious diseases. *Id.* GEO's adversarial and uncooperative approach to working with public health authorities justifies extreme measures in response in order to protect the public from infectious diseases like TB. *Id.*

Contracting one of the infectious diseases discussed above would be disastrous for Plaintiffs' members. For example, GreenLatinos member Annamarie Martinez is an attorney working as the Chief Legal and Policy Officer for the nonprofit Colorado Center on Law and Policy. Martinez Dec. at ¶¶ 2, 3, 14. Her law practice centers around advocating and supporting indigent communities, including immigrants. *Id.* at ¶2. She has had multiple lengthy visits to the ICE Detention Facility in Aurora as part of her work. *Id.* at ¶6. If Big Horn opens, Ms. Martinez is confident she would have to go inside that facility as part of her job. *Id.* at 7.

As a worker at a small nonprofit, Ms. Martinez does not have health insurance, so if she got an infectious disease, she would have to pay for her health care out of pocket. *Id.* at ¶14. The infectious diseases at issue in this case can have very serious outcomes including death. *See Supra* at 13. Ms. Martinez or her colleagues missing work from an infectious disease contracted at Big Horn would undermine their equitable representation of indigent Coloradoans, including immigrants. Martinez Dec. at ¶14. Since demand for legal representation of indigent immigrants is at an all time high, missing work means there would be an increased unmet need for representation, which is the exact opposite of what Ms. Martinez and her organization are working for.

Kimberly Baker Medina is the Legal Director of People Organized to Defend and Resist ("PODER"), a nonprofit organization which is a member of Plaintiff Colorado Immigrant Rights Coalition. Baker Medina Dec. at ¶¶2-3. Ms. Baker Medina faces very similar irreparable harm as Ms. Martinez from the risk of infectious diseases contracted at Big Horn. *Id.* at ¶

But not only does Ms. Baker Medina face this risk for her own exposure when she has to go inside Big Horn, her work also involves training and mentoring a cohort of approximately 40 volunteer attorneys who represent immigrants in removal proceedings. *Id.* at ¶4. She is responsible for keeping these volunteer attorneys safe and ensuring that they have a positive experience. *Id.* at ¶7. If a volunteer contracted an infectious disease from visiting Big Horn, it would significantly harm PODER's volunteer program and also expose PODER to potential liability if the volunteer tried to hold PODER responsible. *Id.* at ¶¶ 8-10.

2. PLAINTIFFS FACE IRREPARABLE HARM FROM AIR POLLUTION

Air pollution Big Horn directly generates or induces also causes irreparable harm to Plaintiffs. Big Horn will contribute to the severe ozone problem in the Metro Denver North Front Range area which includes the Town of Hudson. *See Supra* at 15. Asthmatics, the elderly, children, and people who exercise outside are particularly at risk, including from short-term exposures. *Id.* at 16.

GreenLatinos members live, work, and recreate in the Metro Denver North Front Range ozone nonattainment area and fall into the particularly susceptible categories. For example, GreenLatinos members Annamarie Martinez and Amy Ostwald have

asthma and Ms. Ostwald is also elderly and exercises outside. Martinez Dec. at ¶¶8-10; Ostwald Dec. at ¶¶9-14, 17. Ozone can cause them to have asthma attacks, and suffer other adverse health outcomes including the most irreparable of harms, premature mortality. *See Supra* at 16.

Ms. Martinez and Ms. Ostwald also face asthma attacks, other illnesses, and premature mortality from other air pollutants, including nitrogen oxides and particulate matter when they visit Big Horn should it open. *See Supra* at 19-21, Martinez Dec. at ¶11; Ostwald Dec. at ¶16. As noted above, nitrogen oxides can cause adverse impacts with just a few minutes of exposure, such as the time it could take to walk from one's car in the parking lot to the entrance of Big Horn. *See Supra* at 19.

3. PLAINTIFFS FACE IRREPARABLE HARM FROM TRAFFIC

Traffic caused by Big Horn also will irreparably harm Plaintiffs. Big Horn, which will almost double the Town of Hudson's population, will cause traffic delays in and around Hudson including on the "eastbound" exit off I-76 in Hudson. *See Supra* at 26-27.

This is the exit that GreenLatinos member Annamarie Martinez would take to go to Big Horn during her work day. Martinez Dec. at ¶15. Delays due to traffic to and from Big Horn would waste Ms. Martinez's time that she could be spending on representing immigrants, intrude on other things in her schedule, and generally interfere with her work. *Id.*

4. PLAINTIFFS FACE IRREPARABLE HARM FROM ICE'S PROCEDURAL VIOLATION OF NEPA

Plaintiffs also face procedural irreparable harm due to ICE's failure to conduct a NEPA analysis. In *San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv*., 657 F. Supp. 2d 1233, 1241 (D. Colo. 2009) this Court held that "Plaintiffs' procedural interest in a proper NEPA analysis is likely to be irreparably harmed if [the Defendants] were permitted to go forward with the very actions that threaten the harm NEPA is intended to prevent, including uninformed decisionmaking." In *Davis v. Mineta*, 302 F.3d 1104, 1115 n.7 (10th Cir. 2002) the 10th Circuit held that "if any construction is permitted . . . before the environmental analysis is complete, a serious risk arises that the [required NEPA analysis] will be skewed toward completion of the entire Project." NEPA protects these interests by ensuring "federal agencies are informed of environmental consequences before making decisions." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970–71 (9th Cir. 2003) (citation omitted). Precluding "the kind of public comment and participation NEPA requires" harms Plaintiffs by increasing the risk of an uninformed decision that causes environmental harm. *Id*. at 971.

Outside of this litigation, DHS itself acknowledged that the procedures allowing nongovernmental entity involvement in NEPA analysis results in better outcomes. "In addition, collaboration with other Federal, Tribal, State, and local agencies, as well as **non-governmental organizations** and the general public is an effective way to identify environmental issues that need to be considered in DHS planning and decision-making." Schneider Ex. 1 at IV-6 (emphasis added). Plaintiffs are irreparably harmed

by the denial of these procedures which should result in less infectious disease, air pollution, and traffic.

D. THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR THE PLAINTIFFS

When the government is opposing a preliminary injunction, the balance of equities and public interest factors merge. *Aposhian*, 958 F.3d at 978. The Supreme Court has recognized that "[i]f [environmental] injury is sufficiently likely, . . . the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

The balance of equities and the public interest decidedly tip in favor of issuing a preliminary injunction. Doing everything possible to avoid outbreak of an infectious disease such as TB or measles inside Big Horn which would impact attorneys providing critical legal services to immigrants who cannot afford private attorneys, or spread into the general population in the Metro Denver/North Front Range area, is clearly in the public interest. Lessening air pollution that is regional, like ozone, or localized, like NOx and particulate matter, is also in the public interest and the equitable thing to do. As is protecting the aspen trees in Rocky Mountain National Park, which is not only a natural heritage treasure but also a tourism economic engine for our region. The public interest is also served by ensuring there is not water shortages in the Town of Hudson or Big Horn and that dangerously polluted waters are not discharged in Box Elder Creek, which provides critical habitat for native aquatic species in need of conservation measures, and eventually into the South Platte River. And allowing uninformed and

rushed decisions to cause traffic backups on I-76 or SH 52 does not serve anyone's interest.

To the extent that Defendants claim a legitimate interest in the enforcement of federal immigration law, that interest does not override the public's interest in NEPA's goals of environmental disclosure, consideration of alternatives, and public participation. Moreover, any claims of urgency are undermined by the fact that during the past year federal courts have frequently found ICE's detentions to be unlawful. *See e.g., Medrano-Rocha v. Santacruz*, 817 F. Supp. 3d 871 (C.D. Cal. 2026); *Pacheco v. LaRose*, 818 F. Supp. 3d 1168 (S.D. Cal. 2026); *Omer G. G. v. Kaiser*, 815 F. Supp. 3d 1098 (E.D. Cal. 2025); *Zhang v. Genalo*, 814 F. Supp. 3d 307 (E.D.N.Y. 2025); *see also Maryland v. Mullin*, No. CV 26-733-BAH, 2026 WL 1045503, at *32 (D. Md. Apr. 17, 2026) (citing examples). As the Supreme Court has said, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 766 (2021)*; see also Ramirez Ovando v. Noem*, 810 F. Supp.3d 1209, 1215 (D. Colo. 2025) ("Immigration officials … are authorized to pursue an aggressive deportation agenda. But in carrying out these responsibilities, they must follow the law").

The irreparable harm to Plaintiffs from denying the requested preliminary injunction outweighs any harm to Defendants from the limited delay resulting from the injunction for three reasons. *See Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993). First, Plaintiffs' high likelihood of success on the merits strongly indicates that a preliminary injunction would serve the public interest. *See*

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). There is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (citation modified).

Second, the public interest also favors a preliminary injunction because, lacking an injunction, Plaintiffs would face the immediate serious and irreparable consequences detailed above—harms for which there is no adequate remedy at law if they are allowed to continue and the Court later finds Defendants' actions to be illegal. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) ("recognized the public interest in careful consideration of environmental impacts before major federal projects go forward, and [] that suspending such projects until that consideration occurs 'comports with the public interest.'").

Third, on the other side of the ledger, Plaintiffs' proposed injunction would pose little risk to the Defendants' interests. The proposed injunction is limited and targets only the single Project at issue. It reasonably requests that Defendants maintain the status quo on the Big Horn site until they comply with their obligations under federal law. Temporarily halting construction and preventing initial operation would not bar the project from ever being built, nor harm Defendants' ability to continue to enforce federal immigration law, as the project is not currently facilitating that purpose

Regardless of any arguments from litigation counsel, Defendant DHS essentially agrees with Plaintiffs' position on the balance of equities and public interest. DHS' Directive on Implementing NEPA states: "It is DHS policy to comply with NEPA. Environmental stewardship and DHS missions are compatible and complementary …

Integrating the environmental planning requirements of NEPA with the planning and implementation of DHS actions helps to achieve environmental sustainability goals." Schneider Dec. Ex. 2 at 4. DHS also explains that "the Proponent of a proposed action is responsible for ensuring that the NEPA analysis and appropriate documentation is completed **before** a decision is made and with sufficient time to have a practical influence on the decision making process." *Id.* (emphasis added). Furthermore, "Intergovernmental collaboration and public involvement improve the effectiveness of DHS missions and activities, as well as build trust between DHS and the communities it serves. In addition, collaboration with other Federal, Tribal, State, and local agencies, as well as **non-governmental organizations** and the general public is an effective way to identify environmental issues that need to be considered in DHS planning and decision-making." Schneider Ex. 1 at IV-6 (emphasis added).

E. THE COURT SHOULD REQUIRE ONLY A NOMINAL BOND

In general, a court may issue a preliminary injunction only if the party requesting relief "gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ.P. 65(c). Federal Rule of Civil Procedure 65(c) confers upon district courts "wide discretion in the matter of requiring security and if there is an absence of proof showing a likelihood of harm, certainly no bond is necessary." *Continental Oil Co. v. Frontier Refining Co.,* 338 F.2d 780, 782 (10th Cir. 1964). It is within the courts discretion to decide that "only nominal bonds and nominal liabilities" are required in NEPA cases, and that the imposing a substantial liability would "frustrate the policy of

Congress 'to encourage actions on environmental grounds.'" *Kansas ex rel. Stephan v. Adams*, 705 F.2d 1267, 1269 (10th Cir. 1983). A court may also waive the security requirement if imposition of a bond requirement "would preclude Plaintiffs' request for review…and frustrate the policies underlying NEPA and the APA." *Colo. Wild, Inc. v. United States Forest Service*, 523 F.Supp 2d 1213, 1231 (D. Colo. 2007). The party affected by the injunction bears the "obligation of presenting evidence that a bond is needed." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003).

As explained above, granting of a preliminary injunction is in the public interest and the balance of equities weights in favor of it. Therefore, the Court should require Plaintiffs to post only a nominal bond.

## CONCLUSION

Therefore, for the reasons explained above, the Court should enter a preliminary injunction enjoining Defendants from further construction and renovations and from operating the Big Horn facility until Defendants complete a NEPA analysis and also vacate the contract between ICE and GEO regarding the Big Horn facility.

## CERTIFICATION OF CONFERRING

I confirm that I have conferred with the opposing counsel in good faith regarding this motion, as required under local rule D.C.COLO.LCivR 7.1(a). Even before filing this case, on September 17, 2026, undersigned counsel email the Secretary of Homeland Security, along with the person believed to be in charge of NEPA compliance at the Department of Homeland Security and a U.S. Department of Justice attorney who has worked on defending Defendants in other NEPA challenges to ICE detention facilities

asking them to provide any NEPA analysis regarding the ICE detention facility at issue in this case to avoid the filing of this case. Undersigned counsel got no response.

On September 21, 2026 undersigned counsel emailed three attorneys in the U.S. Department of Justice who have worked on other NEPA cases involving ICE detention facilities, providing them with a courtesy copy of the filed complaint, asking who will be the attorney assigned to this case, and explaining that undersigned counsel wished to confer with Defense Counsel before moving forward on a motion for temporary or preliminary relief.

On September 24, 2026, undersigned counsel had a call with Krystal-Rose Perez, a Senior Trial Attorney, who appears to be assigned to this case to discuss Plaintiffs plans to seek emergency relief. During the call, Senior Trial Attorney Perez informed undersigned that Defendants do not intend to move any detainees into the Big Horn ICE Detention Facility this calendar year, meaning 2026. Based on that, undersigned counsel informed Ms. Perez that plaintiffs will not seek a temporary restraining order.

On September 29, 2026, undersigned counsel emailed Ms. Perez, pursuant to D.C. Colo.LCivR 7.1(a), seeking Defendants position on Plaintiffs' Motion for a Preliminary Injunction and, if Defendants would not agree to the relief requested in the preliminary injunction motion, if Defendants would agree to any stipulations to narrow the disputed issues the preliminary injunction motion. In phone calls and voicemails on October 1 and 2, 2026, Ms. Perez stated that Defendants would not be willing to agree to the relief Plaintiffs' are requesting in this motion and would not be willing to stipulate to anything to narrow the disputed issues in this motion.

On October 5, 2026, undersigned counsel emailed Ms. Perez, pursuant to Fed. R.Civ.P 1 and D.C.COLO.LCivR Rule 7.1(a), asking if she would inform undersigned counsel if Defendants believe there is an EIS, EA or documentation of a categoric exclusion addressing the Big Horn facility. Ms. Perez declined to provide this information.

/s/ Robert Ukeiley
______________________

Dated: October 16, 2026

Respectfully submitted,

/s/ Robert Ukeiley
Robert Ukeiley (Colorado Bar #26747)
Law Office of Robert Ukeiley
255 Mountain Meadows Road
Boulder, CO 80302
Telephone: 720-496-8568
Email: rukeiley@igc.org

Sam Schneider (Colorado Bar #60927)
Metamorphic Law
3900 E Mexico Ave, Ste 300
Denver, CO 80210
Telephone: 720-443-5709 46
Email: sam@metamorphiclaw.com

Alexa McKay (Colorado Bar #50759)
Environmental and Animal Defense
501 S. Cherry St. Suite 1100
Denver, CO 80246
Telephone: 720-722-0336
Email: amckay@eadefense.org

Jeremy McKay (Colorado Bar #51433)
Environmental and Animal Defense
501 S. Cherry St. Suite 1100
Denver, CO 80246
Telemphone720-722-0336
Email: jmckay@eadefense.org

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2026, I electronically filed the foregoing Plaintiffs' Motion for a Preliminary Injunction, along with all exhibits, using the CM/ECF system, which will send notification of such filing to counsel of record. I also had a copy mailed to:

Krystal-Rose Perez
Senior Trial Attorney
ENRD-Natural Resources Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611

/s/ Robert Ukeiley
Robert Ukeiley